L. A. & W. O. ELLIS v. A. S. VALENTINE & SON ET ALS.

(Case No. 2188)

1. STATUTE OF FRAUDS—INSOLVENT DEBTOR—RIGHT TO PREFER CREDITORS—MAY SELL OR CONVEY PROPERTY IN PAYMENT OF ONE OR MORE JUST DEBTS TO EXCLUSION OF OTHERS—CREDITOR—Every debtor has the legal right to pay one or more of his just debts with any money or other property of his, though he may thereby with-

draw from the reach of other creditors property which they might subject to payment of their debts equally just, as also has every creditor the legal right so to receive payment; and this right of either is not affected by the fact that the debtor is insolvent.

2. SAME—If, for such a purpose, the debtor conveys or sells, at a fair price, to some person who, by the terms of the sale, is bound to see, and does. see, that the money is at once appropriated to that purpose, then it cannot be said that the sale, within the meaning of the law, is made to hinder, delay or defraud other creditors, who may not have received any of the proceeds. R. S., art. 2465.

3. SAME—HINDRANCE OR DELAY CONTEMPLATED BY STATUTE DEFINED—FRAUD—The hindrance or delay contemplated by the statute (R. S., art. 2465) has in it the element of fraud, and if a hindrance or delay be found in any case to be free from such element, then it is not of that character which, under the statute, vitiates conveyances. (Citing Bump on Fraud. Conv., 20.)

4. SAME—INTENTION TO HINDER, DELAY, OR DEFRAUD MUST EXIST AND BE COUPLED WITH CONVEYANCE HAVING THAT EFFECT—Under the statute, an intention to hinder, delay, or defraud must exist, but the mere intention can have no effect, if considered alone, in determining whether a conveyance is lawful or not. The intent must be coupled with a conveyance which has the effect, if permitted to stand, to hinder, delay or defraud creditors, otherwise it does not become a matter of private right, since mere intent, however wrongful, interposes no obstacle to the successful assertion of any right a creditor may have to enforce payment of a debt through the sale of his debtor's property.

5. SAME—CREDITOR— DEBTOR—CREDITOR IN GOOD FAITH MAY ACQUIRE PREFERENCE OVER OTHER GENERAL CREDITORS— CREDITOR WITHOUT LIEN NO RIGHT TO PAYMENT OUT OF PARTICULAR PROPERTY—No creditor, without a lien, has the right to have the debt due to him paid out of any particular property of his debtor, but any *bona fide* creditor may, in good faith, acquire a right in reference to his debtor's property, which the general creditors do not possess.

6. SAME—INSOLVENT DEBTOR—MAY PAY OR SECURE BONA FIDE DEBT, THOUGH DONE WITH INTENT TO GIVE PREFERENCE—The acquisition of a lien on a part or the whole of an insolvent's property, to secure a debt, and a sale thereunder, necessarily tends, in a popular sense, to hinder and delay, and it may be even to defeat other creditors in the collection of their debts, and so also does every payment of a debt by a person unable to pay all his debts, whether the payment be in money or in property; nevertheless, if the lien or the payment be of a *bona fide* debt, it is valid, in the absence of any law declaring preferences invalid, even though the debtor pays the debt or gives the lien with intent to secure to the favored creditor an advantage over other creditors.

7. SAME—INSOLVENT DEBTOR—LAWFUL TO PAY OR SECURE A DEBT—LAWFUL ACT NOT RENDERED UNLAWFUL BY UNFRIENDLY MOTIVE—HINDRANCE OR DELAY NOT PROHIBITED UNLESS A FRAUD ON CREDITORS—It is lawful to pay any debt or to secure its payment, unless there is some law in force looking to the distribution of an insolvent's estate, without preferences; and what it is lawful to do cannot become unlawful, by reason of the fact that it is done through a motive, or with an intent, not friendly to all creditors. A hindrance or delay which does not operate as a fraud upon creditors is not that prohibited by law.

8. SAME—DEBTOR—CREDITOR—SALE—TO VITIATE, INTENT MUST BE TO HINDER, DELAY OR DEFRAUD CREDITORS—SUCH INTENT CANNOT EXIST IF PURPOSE BE PAYMENT OF ONE OR MORE JUST DEBTS—To vitiate a sale the intent of the seller must be to hinder, delay or defraud his creditors, and such intent cannot exist, if the purpose be to appropriate the property or its proceeds, at its fair value, to the pay-

ment of one or more just debts, in a manner and at a time satisfactory to the creditors to be paid.

9. SAME—PURCHASER—INTENT—NOTICE—The notice to the grantee must be a notice of an intent on the part of the debtor to hinder, delay or defraud in the legal sense of those words.

10. SAME—DEBTOR—CREDITOR—PURCHASER—If the intended and necessary effect of a transfer be to discharge one or more just debts of the seller by a present application of the full value of the property, in a manner agreed to by the preferred creditors, it would seem that the purchaser would stand on ground as favorable as though he were a purchaser for the sole purpose of securing a debt due to himself.

11. SAME—FRAUD—WHEN A QUESTION OF LAW—Fraud, or no fraud, is ordinarily a question of fact, but, if the facts be admitted, whether they constitute fraud within the meaning of the statute becomes, in many cases, a matter of law.

12. SAME—SALE BY DEBTOR—PURCHASER—KNOWLEDGE OF INTENT TO PREFER CREDITORS—Knowledge by the purchaser that the debtor intended, after paying certain debts with a part of his property, to apply a part or the whole of the residue to the payment of other just debts, even by way of preferences, would no more vitiate the sale than would a knowledge that, in making payment of the debts first satisfied, the intention of the debtor was to give preferences.

13. SAME—ATTACHMENT—DEBTOR—CREDITOR—PURCHASER—SUIT FOR WRONGFUL SEIZURE AND CONVERSION OF PROPERTY—ILLEGAL SALE—BURDEN OF PROOF—DECLARATIONS OF THIRD PARTY—EVIDENCE—In a suit by one creditor against other attaching creditors for a wrongful seizure and conversion of property sold by their common debtor, who was insolvent, to the plaintiff, in satisfaction of a debt due to him, in which suit the defendants pleaded that the sale was made by the debtor to hinder, delay and defraud his creditors,—held:

(1) That the burden of proof was on the defendants to show the illegality of the sale ;

(2) That the declarations of a third person, before the sale, to the effect that he wanted to borrow for the debtor $10,000, and would secure the lender by the debtor's power of attorney, not made in the presence of the debtor or the plaintiff, and not shown to have been authorized by the debtor, were not admissible in evidence against the plaintiff.

14. CASES CITED AND APPROVED—The cases of Ford v. Williams, 3 B. Monroe 557 ; Brown v. Foree, 7 B. Monroe 357 ; Gregory v. Harrington, 33 Vt. 241 ; Bedell v. Chase, 34 N.Y. 386 ; Wood v. Shaw, 29 Ill. 444 ; Wheaton v. Neville, 19 Cal. 46; Hall v. Arnold, 15 Barb. 600 ; Uhler v. Maulfair, 23 Pa. St. 884 ; Bank v. Carter, 38 Pa. St. 446 ; Johnson v. McGrew, 11 Ia. 152 ; Hartshorn v. Eames, 31 Me. 98; Gassett & Co. v. Wilson & Brown, 3 Fla. 258, 261; Covanhovan v. Hart, 21 Pa. St. 500; Dana v. Stanford, 10 Cal. 274; Worland v. Kimberlin, 6 B. Monroe 609; Bank v. Fitch, 48 Barb. 354; Banfield v. Whipple, 96 Mass. 14; Giddings v. Sears, 115 Mass. 507; Bank v. Nelson, Cold. 150; Lowry v. Howard, 35 Ind. 170, cited and approved.

APPEAL from Galveston. Tried below before the Hon. W. H. Stewart.

This suit was filed by appellants, January 17, 1885, against A. S. Valentine & Son, and their sureties on an indemnity bond and the sheriff, for unlawfully seizing and converting a lot of goods valued at $1,091.20, and alleged to have been seized December, 23, 1884.

Defendants answered by general demurrer, general denial, not guilty, and special plea that the goods were transferred to plaintiffs by Ross & Russell, on December 20, 1884, with intent to hinder, delay and defraud their creditors, of which intent plaintiffs had notice; that defendants Valentine & Son were creditors of Ross & Russell, and, on December 22, sued out a writ of attachment, which was levied on the goods; that they were required by the sheriff to give an indemnity bond, etc., and that the sale to plaintiffs was void through fraud.

Plaintiffs, by supplemental petition, denied all fraud and notice of fraud, and alleged that Ross & Russell sold their stock of goods to L. A. Ellis to pay a *bona fide* debt of $7,650, due him by them, and to pay *bona fide* debts due by them to the Texas Banking and Insurance company, of Galveston; that the sale was *bona fide*; a fair and reasonable price was paid, and that the proceeds were applied to the payment of Ross & Russell's debts, as was agreed should be done.

The facts, as disclosed by the record, are about as follows:

In the spring of 1884, Ross & Russell sold a lot of sugar and molasses which Colonel Ellis had consigned to them, and, at their request, he agreed to let the proceeds, amounting to nearly 2,700, remain with them until fall. About October 10, 1884, Colonel Ellis accepted for Ross & Russell, for their accommodation, to the amount of $5,000, payable at the office of the Texas Banking and Insurance company, at Galveston. When due, or just before, he, at the request of Ross & Russell, telegraphed the bank to extend the draft twenty days, so that it became due December 31. Colonel Ellis was known to the bank to be entirely responsible. He and Major Russell were old friends, and had been merchants at Jefferson for a number of years, but not partners. He had a very limited acquaintance with Mr. Ross.

About December 10, Ross & Russell applied to Ellis for a further loan of $10,000 or $12,000, and exhibited to him a statement, made out by their book-keeper, showing their condition. Ellis did not make the loan, but said he would consider it, and in a few days would be in Galveston. He came to Galveston, December 18, and talked with their book-keeper and N. B. Sligh, cashier of the bank, about Ross & Russell's condition. After this, as he testified, he became somewhat alarmed about his debt, then amounting to nearly $7,700, as Ross & Russell had a good deal of paper maturing at the bank, and money matters were very stringent, and he declined to make the loan. He then proposed to them to take enough goods to pay his debt. They said, if it came to that, they would sell the whole stock; that they had other debts to pay, and to pay him in goods would cripple their stock. He asked for security, but they said they did not want to ask

their friends to endorse for them further. At this time they owed the bank about $32,000, for which the bank held their notes, most of which were endorsed by their friends. These notes had been discounted at the bank and the money used by Ross & Russell in paying their merchandise creditors, and, up to December 20, they had paid all notes and drafts against them for goods, but there were some unpresented accounts due for goods, which were unpaid.

On December 20, Colonel Ellis bought Ross & Russell's entire stock of goods at seventy cents on the dollar of invoice stock, which the testimony of plaintiffs' witnesses showed to be a fair price, and agreed to apply the entire proceeds to the payment of his debt and the debts of Ross & Russell due the bank. The sale was agreed on before dinner, on December 20, and after dinner, about one or two o'clock p. m., Colonel Ellis wrote the following bill of sale:

"Ross & Russell, a mercantile firm composed of James O. Ross and James P. Russell, in the city of Galveston, Texas, have this day sold and delivered to L. A. Ellis, of Fort Bend county, Texas, all of our stock of groceries, goods, wares and merchandise now in the storehouse occupied by us on the corner of Twenty-fourth and Strand streets, and stored in warehouse in the city of Galveston. The said stock of goods, wares and merchandise is to be promptly invoiced, each and every article at its original cost, and the consideration to be paid by L. A. Ellis for said stock of goods, wares and merchandise is seventy cents for each dollar's worth of groceries, wares and merchandise embraced in said invoice, and the said total amount is now paid and to be paid as follows: First, L. A. Ellis is to receipt us for $7,611.80, which we are now owing him; said Ellis then assumes to pay on the indebtedness of ours to the Texas Banking and Insurance company the balance that may be due said Ross & Russell on said purchase of groceries, goods, wares and merchandise."

The above was signed by Ross & Russell and Ellis, and witnessed. The possession of the goods was immediately delivered to Ellis, who insured them that evening for $30,000, and the invoicing was at once begun. The stock was estimated by all the parties at $40,000 at original cost, so that it was expected it would cost Ellis $28,000 in cash, including his debt. Ellis obligated himself to Ross & Russell, however, to pay first to the bank $20,000 on such of Ross & Russell's indebtedness as they should designate, and apply the balance to the payment of his debt, and if there should still be any balance, it was to go to the payment of their debt due the bank.

About four o'clock, on the afternoon of December 20, Ross and Russell and Ellis went, together, to the bank, where N. B. Sligh, the

cashier, wrote an order addressed to Ellis, and which was signed by Ross & Russell, directing Ellis to pay, as part of the purchase money for the goods, eight notes, giving dates, amounts, etc., due by them to the bank, and aggregating $19,996.68. Ellis verbally accepted this order, and paid the bank $3,000 that evening. His assumption of the amount was satisfactory to the bank, which at that time held for collection, paper belonging to Ellis, amounting to about $20,000, being drafts drawn for sugar and molasses sold by him. After accepting the order, Ellis told Sligh he wanted some showing to release Ross & Russell, when Sligh wrote and signed, as cashier, on the back of the order the following: "Received from L. A. Ellis, in cash and his paper, in full satisfaction of the within paper, $19,996.68. We hold no collateral securities for any of the within papers other than the endorsers on same."

Colonel Ellis paid his acceptance and the notes assumed as they matured, and the uncontradicted evidence of Ross and Russell, and Captain Leigh, their book-keeper, and N. B. Sligh, cashier of the bank, is that the notes assumed and paid by Ellis were *bona fide* debts of Ross & Russell.

The stock invoiced $35,704.91, and, at seventy cents, brought $24,993.43. The day after the invoicing was begun, Ellis told Ross & Russell that the stock would fall short of the estimate, and, as he had assumed the payment of $20,000 to the bank, they ought to protect him as to the balance. They said this was right, and turned over to Ellis about $4,000 of notes and accounts, out of which he collected the deficiency (nearly $2,700, after paying his debt and the bank) and turned the balance back to Ross & Russell, which they used in paying a debt to the bank.

On the evening of December 19, Colonel Ellis being satisfied he would close the trade, telephoned his son, W. O. Ellis, who lived at Houston, to come to Galveston, and, being unable to attend to the business personally, transferred a half interest to his son.

On the night of December 20, between eight and nine o'clock, the first attachments were run by creditors of Ross & Russell, and levied on portions of the goods, which were taken from the possession of the plaintiffs. Other attachments were run from that time until December 24; that of defendants, Valentine & Son, on December 23. The aggregate amount of the attaching creditors' debts is $8,300. The figures, as admitted on the trial by the parties, showed that the officers seized, under these attachments, goods that originally cost Ross & Russell $14,350. The goods seized brought at sheriff's sales $10,569.62, less costs of sales, $680.01, making the net amount realized $9,889.61, less

court costs, other than the costs of sales. Ellis paid for these goods, at seventy cents on the dollar, $10,045. Plaintiffs realized from the goods not attached, at retail or in job lots, $8,300, and then sold the balance, in bulk, to Heidenheimer & Co., at fifty-five cents on the dollar of invoice cost, amounting to $5,084. Plaintiffs have sued the attaching creditors for the goods seized, the aggregate value alleged being $17,110.

Colonel Ellis testified that his only object in buying the goods was to collect his debt; that he did not want to buy the stock, and, after his purchase, told Ross & Russell he would give anyone $500 to take the trade off his hands, as he preferred to lose $500 of his debt rather than to take the stock; that after buying he thought of replenishing the stock and trying the business, but, after the attachments, he concluded to sell the goods, and those that were not attached were sold for the best prices obtainable in the market; that he did not think Ross & Russell were embarrassed when he accepted for them for $5,000, as nearly every merchant in Texas was pretty "hard up" about that time, and there was a general feeling of distrust with the banks; that he did not know that Ross & Russell were insolvent when he bought them out, but knew they were indebted to the amount of $70,000, and that a large amount of this was due or rapidly becoming due; that, if by insolvency is meant that Ross & Russell did not have sufficient assets to pay all their debts, he did not think they were insolvent, but, with the assets they had, they were unable to pay their debts as they matured, and it required time to realize on them in order to liquidate their debts in full; that, if their goods had been sold at forced sale and collections forced by law, he did not think they would have realized enough to pay all they owed, but, with a proper administration of their assets, and reasonable time afforded, he thought they would have paid out; that they never proposed to sell, except for the purpose of paying their debts; said they wanted to pay their paper endorsed by their friends, and that they contemplated continuing their cotton and commission business; that he acted on the advice of counsel in the matter, and the sale of the goods was absolute and unconditional.

Mr. Ross and Major Russell testified that they sold out to Ellis in order to go out of the grocery business, and to pay their debts; that they were at a heavy expense; that trade was dull, money matters stringent, and that they did not have money to carry on the grocery business, which was losing them money; that every dollar of their assets had gone towards the liquidation of their debts; that they expected to go on with their cotton and commission business, collect

what was owing to them, pay their debts and have something left for themselves, but the attachments stopped collections and broke up their business. After the attachments, they transferred about $14,000 of their claims to pay debts owing by them to Isaac Heidenheimer, and, after this, they transferred about $60,000 of their claims to Heidenheimer and T. L. Ross, for the purpose of raising means to pay debts. The record shows that they thus paid over $40,000 of their debts, in addition to the amount paid by Colonel Ellis.

On the trial, Isaac Heidenheimer, a witness for defendants, testified that "two or three weeks before the sale made by Ross & Russell to Ellis, Jenkinson came to me and wanted to borrow $10,000 for Ross & Russell, and said he would secure me by power of attorney, which he said he could get from Ross & Russell, so as to protect me from loss in case of trouble, but I declined to lend the money."

To these statements of Jenkinson, plaintiffs objected, because it was not shown, or offered to be shown, that Ross & Russell authorized any such proposition, and because the testimony was hearsay, and misleading and irrelevant as to plaintiffs. Jenkinson, it appears, was a clerk in the employ of Ross & Russell.

The cause was tried before a jury, the trial resulting in a verdict and judgment for defendants. The plaintiffs appealed, and assigned the following errors, amongst others:

"1. The charge of the court, as given, on the issue of the validity of the sale by Ross & Russell to L. A. Ellis, including appellees' charges one, two, three, five, seven, eight, nine, ten, eleven and twelve, on that issue, is erroneous and misleading, in that it fails to give the law applicable to the case, and in ignoring the necessary element of fraud to constitute an unlawful hindering or delaying, and, in effect, negativing the right of an insolvent or embarrassed debtor to prefer creditors, or to sell his property at a fair price to pay *bona fide* debts."

"2. Under the pleadings and evidence, the issue as to the validity of the sale was, whether it was a *bona fide* sale, for a fair price to pay debts, or a simulated sale, or upon a secret trust, and the court erred in refusing to give charge number two, as asked by appellants, which correctly stated the law applicable to the case; and the court erred in qualifying that charge and giving it, as so qualified, over appellants' objections, because, as qualified, it, in effect, denied to Ross & Russell the right to sell their property to pay their debts, and to L. A. Ellis and other creditors the right to receive property in good faith, and at a fair price, in payment of *bona fide* debts, and erroneously assumed that secret feelings or motives could change the character of

an honest act; and the charge, as given, was misleading and on the weight of evidence."

"3. There is no fraud in an insolvent debtor's appropriating his property to the payment of some of his creditors in preference to others, nor in some creditors accepting, in good faith, property from their debtor in payment of their debts, although they may know that other creditors will thereby be delayed, hindered or defeated; and the court erred in giving appellees' charge number one, which effectually charges to the contrary."

"4. The court erred in giving appellees' charges two, three, five, ten and eleven, because they erroneously assume that the sale of their goods to L. A. Ellis enlarged Ross & Russell's power over their assets not subject to execution, so that they could fraudulently withhold or dispose of them, and that any intent on their part to dispose of their other assets, or to propose terms of settlement to their creditors, was necessarily fraudulent, and because said charges make the validity of the sale depend, not upon a fraudulent disposition of the goods sold, but upon how the vendors should subsequently 'arrange their affairs,' and the charges are misleading and wholly unwarranted by the evidence."

"5. The court erred in giving appellees charges seven and eight, which are erroneous and misleading, in that in the definition of 'to hinder' and 'to delay,' in charge seven, the necessary element of fraud to constitute an unlawful hindering or delaying is omitted and ignored; and said charges require the jury to base a verdict against the validity of the sale upon their belief of the vendee's knowledge or belief, or reason to suspect, that the vendors made the sale with intent to hinder or delay any of their creditors, and make such knowledge or belief, or reason to suspect such intent, conclusive evidence of fraud, notwithstanding the vendee was a creditor and the sale was absolute and unconditional and for a fair price, and was made to pay *bona fide* debts of the vendors, and the proceeds were so applied; and the charges are on the weight of evidence, and assume that Ross & Russell were not only insolvent, but made the sale with intent to hinder or delay their creditors."

"7. Under the pleadings and evidence, the burden of proof on the issue of the *bona fides* of the sale was on appellees', and the court erred in refusing to so charge, as requested by appellants."

"14. The court erred in allowing the witness, Heidenheimer, to give, over appellants' objections, statements of S. N. Jenkinson, as shown in appellants' bill of exception number one." The charges complained of, and also those which were refused, are set forth in the opinion.

*Denson & Burnett* and *Wheeler & Rhodes*, for appellants, on what is necessary to constitute a conveyance fraudulent, and on the right of a creditor to take from his debtor a transfer with the honest purpose of securing his own debt, even though he may know that his debtor thereby intended to hinder and delay other creditors, cited: Wait on Fraud. Conv., secs. 11, 196; Bump on Fraud. Conv., 19; Bunn *v.* Ahl, 29 Pa. St. 390; Rice *v.* Perry, 61 Me. 149, 150; Greenleve *v.* Blum, 59 Tex. 126; Schneider *v.* Sansom, 62 Tex. 203; Thornton *v.* Tandy, 39 Tex. 547; Bump on Fraud. Conv. 189, 205, 206; Wait on Fraud. Conv., secs. 189, 273; Brown *v.* Foree, 7 B. Monroe, 357; s. c., 46 Am. Dec. 519; Crawford *v.* Kirksey, 50 Ala. 591; s. c., 28 Am. Rep. 704; Shelley *v.* Boothe, 73 Mo. 74; s. c., 39 Am. Rep. 480; Auburn Bank *v.* Fitch, 48 Barb. 353, 354.

That secret motives cannot change the character of a lawful act, they cited: 1 Story Eq. Jur., sec. 369, note 4, and sec. 370; Covanhovan *v.* Hart, 21 Pa. St. 500; s. c., 61 Am. Dec. 519; Horwitz *v.* Ellinger, 31 Md. 504.

On the burden of proof, they cited: King *v.* Russell, 40 Tex. 132; Belt *v.* Raguet, 27 Tex. 479; Bump on Fraud Conv., 3d ed., p. 600; Wait on Fraud. Conv., sec. 271.

And upon the several questions presented by the assignments, the following additional authorities: Linn *v.* Wright, 18 Tex. 340; Bump on Fraud. Conv., 3d ed., p. 20; Heffner *v.* Metcalf, 1 Head. (Tenn.) 576, 580; Rindskoff *v.* Guggenheim, 3 Cold. 282; Rosenthal *v.* Middlebrook, 63 Tex. 337.

*McLemore & Campbell* and *Scott & Levi*, on the questions discussed in the opinion, cited: Mosely *v.* Gainer, 10 Tex. 393; Edrington *v.* Rogers, 15 Tex. 188; Hancock *v.* Horan, 15 Tex. 511; Wright *v.* Linn, 16 Tex. 35.

It is not enough that the sale be for a valuable consideration, but also must be "*bona fide:* " Mills *v.* Howeth, 19 Tex. 257; Carlton *v.* Baldwin, 22 Tex. 724; Humphries *v.* Freeman, 22 Tex. 45; Baldwin *v.* Peet, 22 Tex. 708; Green *v.* Banks, 24 Tex. 508; Garrahy *v.* Bayley, 25 Tex. 295; Bailey *v.* Mills, 27 Tex. 434; Frazer *v.* Thatcher, 49 Tex. 26; Cox *v.* Miller, 54 Tex. 27; Blum *v.* Schram & Co., 58 Tex. 529, *et seq*; Lewy *v.* Fischl, 65 Tex. 311; Miller *v.* Jannet, 63 Tex. 86; 1 Greenl. Ev., secs. 53, 462.

STAYTON, ASSOCIATE JUSTICE—Under the evidence in this case, there can be no doubt that Ross & Russell sold their entire stock of goods to L. A. Ellis, and that, as the consideration, the latter can-

celled a debt of $7,611.80, due to him by them, and contracted to pay, and actually did pay, on the indebtedness of Ross & Russell to the Texas Banking and Insurance company, the sum of $19,996.68. Some of the money owing to the bank was past due, and the residue soon maturing. By the terms of the contract, Ellis was not to pay to the bank, indebtedness for which it held collateral securities.

The evidence further shows that Ross & Russell were greatly in debt at the time they sold to Ellis, and that they had, as part of their assets, other than the goods sold to Ellis, claims amounting to over $100,000, Whether such assets would ultimately be sufficient to pay their entire indebtedness cannot be determined from the record before us.

The questions which are presented for our consideration arise mainly upon the action of the court below in giving charges, and in refusing to give charges which were asked. The appellees claim that the goods were liable to seizure and sale, under their attachment, on the ground that the sale by Ross & Russell to Ellis was made with intent, upon the part of the former, to hinder, delay or defraud their creditors, which intent, they claim, was known to Ellis at the time he bought.

The views of the court below will be illustrated by the charges given and refused. The court gave a charge, without request, which consisted of four paragraphs, the first of which embraces the leading proposition of law which runs through the whole. That paragraph is as follows :

"An insolvent debtor may lawfully prefer one or more creditors, if he does not make such preference to hinder or delay other creditors, but, if done with intent to hinder or delay other creditors, and the preferred creditor, at the time of the attempted preference, had notice of such intent, then the attempted preference would be illegal and void."

Appellants asked the following charge : " If the sale to Ellis was made by Ross & Russell in good faith, and without any reservations of benefit in themselves, and for the purpose of paying a *bona fide* debt due by them to Ellis, and also *bona fide* debts owing by them to the Texas Banking and Insurance company, and the proceeds were so applied, and Ellis paid a reasonable and fair price for the goods, considering the character of the stock and its value at the time, then you will find for plaintiffs."

The court refused to give this charge, but struck out the last six words, " then you will find for plaintiffs," and added the following, "then the sale and delivery to Ellis would pass the title to Ellis, un-

less made to hinder or delay creditors by Ross & Russell, with notice on the part of Ellis of such intent," and gave the charge as modified.

Appellants duly excepted to the refusal of the court to give the charge as asked, and to its giving the charge as so modified.

The court, at the request of the defendants, gave fourteen separate charges, to the sixth, thirteenth and fourteenth of which no objection is urged, but objection is made to all the others. The substance of the propositions of law contained in these several charges, except the fourth, is found in the first, second, third, fifth, seventh and twelfth charges given, which are as follows:

"1. If you believe that, on December 20, 1884, Ross & Russell were insolvent, and that, on or about that date, they disposed of all their merchandise to L. A. Ellis, to pay their debts to Ellis and the Texas Banking and Insurance company, in preference to their other creditors, and retained in their possession and control only such assets as could not be reached by execution; if you believe that the latter assets were, at or nearly at the time, disposed of to pay other preferred creditors, and that by such disposition of their estate the general creditors of Ross & Russell were hindered, delayed, defeated or defrauded in the collection of their claims, and that this result was designed by Ross & Russell, and that L. A. Ellis had notice of such design, you will find for defendants."

"2. If you believe that Ross & Russell, in selling out to L. A. Ellis, intended to dispose of all their property subject to execution, and to obtain possession and control of property not subject to execution, in order to delay, hinder or defraud their creditors in the collection of their claims, or to dictate terms of extension or settlement to their creditors, and that Ellis knew, or had reason to believe, that such was their purpose, the sale to Ellis was void as to creditors, notwithstanding it may have been made for a valid consideration, and that the proceeds were all applied to the payment of preferred claims, and you will find for the defendants."

"3. If you believe that in the sale to Ellis, Ross & Russell intended to remove all their property from liability to seizure, either by execution, attachment or garnishment, so that they could dictate such terms to their creditors as they might find best for their own interest, and that Ellis knew of this intention, or was sufficiently acquainted with their affairs to suspect it, the sale was void as to creditors, notwithstanding it may have been made for a valid consideration and the proceeds applied to the payment of preferred creditors, and you will find for the defendants."

"5. If the jury believe, from the evidence, that Ross & Russell

were in embarrassed circumstances, and were being pressed by their creditors to pay their debts, and they could not, and L. A. Ellis knew their condition, or upon reasonable inquiry could have ascertained it; and if you further believe, from the evidence, that the intention of Ross & Russell, in selling their entire stock of goods to L. A. Ellis, was in order to pay what they owed to L. A. Ellis and the Texas Banking and Insurance company, so that thereby Ross & Russell might hold the balance of their assets in such a manner as to hinder or delay their creditors from collecting their debts, then you are charged that the sale to L. A. Ellis of the stock of goods was a fraud on the creditors of Ross & Russell, and void, provided L. A. Ellis had reasonable grounds to believe that such was the intention of Ross & Russell."

"7. If this alleged sale was made by Ross & Russell to Ellis, with intent to hinder or to delay, or to defraud, their creditors, and Ellis had notice of such intent, then your verdict must be for the defendants, whether Ellis paid any money or not. 'To hinder' and 'to delay' is to do something which is to put some obstacle in the path, or to interpose something, unjustifiably, before the creditor can realize what is owed out of his debtor's property. Express notice or knowledge on the part of Ellis that it was the intent of Ross & Russell, in making the alleged sale, to hinder, or to delay, or to defraud, their creditors, or any of their creditors, is not required in order to prevent a recovery by the plaintiffs. If the circumstances attending this alleged sale by Ross & Russell to Ellis were such as would have led a man of ordinary prudence to make inquiry, and such inquiry would have shown reasonable grounds for believing that the sale was being made for the purpose of hindering or delaying, or defrauding, the creditors of Ross & Russell, then the transaction was fraudulent in law, and the plaintiffs cannot recover. To refrain from inquiry, when the circumstances are such as to put a man of ordinary prudence on inquiry, is, in judgment of law, a want of good faith."

"12. Ross & Russell had the right to prefer one or more of their creditors over the others in the appropriation of their assets to the payment of their debts, provided their purpose was simply to pay one or more, rather than the others, and such purpose was unmixed with an intention, by the same act, to directly or indirectly impede or prevent, or hinder or delay, their other creditors in forcing the payment of their claims. If, in making the transfer to Ellis of their stock of goods, Ross & Russell intended not merely and simply to pay some of their creditors in preference to others, but also intended by that act to directly or indirectly impede, delay, hinder or prevent

any of their creditors from forcing the payment of their claims, and Ellis had knowledge of, or reasonable ground to suspect, such intention, then the transfer was void as to creditors of Ross & Russell, and you will return a verdict for defendants."

By the seventh charge, given at the request of the defendants, the jury were instructed as to the meaning of the words "hinder" and "delay." In that charge it was said that "to hinder and to delay is to do something which is to put some obstacle in the path, or to interpose something, unjustifiably, before the creditor can realize what is owed out of the debtor's property." This definition is defective and too loose to be given to a jury, in that it fails to inform what character of obstacles or interpositions in the way of the creditor's reaching the property of the debtor are in law unjustifiable. That was left to the determination of the jury, which would have been less likely to have been misled had no charge at all been given attempting to define the words "hinder" and "delay," unless the law be that every act of the debtor, by which his property is transferred or otherwise disposed of, is an unjustifiable obstacle or interposition in the way of subjecting the debtor's property to the payment of one or more creditors. The jury, doubtless, looked to the other charges to ascertain what state of facts would render the sale to Ellis invalid, but it was to this charge to which they would very naturally look to ascertain what the particular words, in their connection, meant as used in other parts of the charge.

If we look at the first charge given by the court, we perceive that the jury were, in effect, told that a preference given to one or more creditors, if given with intent to hinder or delay other creditors, would be an obstacle in the way of a creditor, or creditors, not preferred, which would be so far unjustifiable as to render the conveyance, by which such preference was given, void, if the preferred creditor knew of the intent of the debtor.

If the words "hinder" and "delay" were used in the statute in their broadest sense, then every preference given by an insolvent debtor would have the effect to hinder or delay the non-preferred creditor in subjecting the property of his debtor to sale for the payment of his debt. The effect of a preference given to one or more creditors by an insolvent debtor is necessarily to "hinder" or "delay" other creditors, if those words are used in their broad and popular sense. The law presumes that every sane man intends to do what necessarily and inevitably results from his act; hence, if the propositions contained in the first charge were correct, every prefer-

ence given by an insolvent debtor would be an unjustifiable obstacle or interposition placed in the way of other creditors. Such a holding, in the absence of a law forbidding preferences, finds nothing in the past rulings of this court, or any other, to sustain it.

The charge asked by the appellants, as qualified and given by the court, informed the jury that, notwithstanding the goods may have been sold by Ross & Russell in good faith, absolutely and without any reservation of any interest to themselves, for a fair price, and to discharge *bona fide* debts due to the purchaser and others, such a sale would be void, even though, in accordance with the terms of the sale, the purchase money was applied to the payment of the debts, by the purchaser, if the intent of the sellers was to hinder or delay their creditors, such intent being known to the buyer. There was a strange inconsistency in the charge as qualified.

The charge, as asked, contemplated *good faith* in Ross & Russell in selling to pay, and in the actual payment of, *bona fide* debts, with the proceeds of the goods sold for a reasonably fair price. The qualification left the jury to understand that good faith might exist in the sale, that the sale might be made for a fair price and for a lawful purpose, and that the price might be appropriated by the buyer directly to that purpose; and, yet, that there might be, within the meaning of the law, an intent on the part of the sellers, known to the buyer. to hinder or delay other creditors. The proposition contained in the charge, as asked, was based on facts which would, if found to exist, preclude an intention to hinder or delay other creditors. The one is based on good faith and fair dealing, which does not consist with the other, based on fraud.

The hindrance and delay contemplated by the statute has in it the element of fraud, and if a hindrance or delay be found in any case to be free from this element, then it is not of that character which, under the statute, vitiates conveyances. Bump. on Fraud. Conv., 20.

This confusion doubtless arises from the fact that the court used the words "hinder" or "delay" in their popular, and not in their legal sense, and thus left the jury to understand that a sale, made in good faith, for a fair price, and for a lawful purpose consummated, was "to do something which is to put some obstacle in the path, or to interpose something, unjustifiably, before the creditor can realize what is owed out of his debtor's property."

It is well to have a fair understanding of the true meaning of the terms used in the statute, and of their relations, that we may know whether the act permits or forbids a given line of conduct. The statute is but declaratory of the common law, and, it is probable,

would accomplish the purpose intended were the words "hinder" or "delay" eliminated, and a fair construction put upon the word "defraud." Under the statute, an intention to hinder, delay or defraud must exist, but the mere intention can have no effect, if considered alone, in determining whether a conveyance is lawful or not. The intent must be coupled with a conveyance, which has the effect, if permitted to stand, to hinder, delay or defraud creditors, or it does not become a matter affecting private right, as mere intent, however wrongful, interposes no obstacle to the successful assertion of any right a creditor may have to enforce payment of a debt through the sale of the debtor's property.

No creditor, without lien, has the right to have the debt due to him paid out of any particular property of the debtor. All creditors have the same right to have their debts paid out of the property of the debtor, unless, by contract with the debtor, or by legal process, one or more acquire a right to be paid out of the proceeds of some particular property, or to have some particular thing, by way of sale, in satisfaction of his or their debt. The right of any *bona fide* creditor in good faith to acquire rights in reference to the debtor's property, which the general creditor has not, is recognized in all civilized countries.

The acquisition of a lien on a part or the whole of an insolvent's property, to secure a debt, necessarily has the effect to hinder another creditor in the enforcement of the payment of a debt due to him by a sale of the entire interest in the property on which the lien is given; but if the lien be to secure a *bona fide* debt, it is valid, even though the debtor gave it with intent to secure to the favored creditor an advantage over other creditors, and, thus, to hinder, delay, or even to defeat the collection of their debts. This is so, simply because the property is devoted to a lawful purpose, and while withdrawn from one or more creditors, there is no fraud in so doing, for it is lawful to pay any debt, or to secure its payment, unless there be some law in force looking to the distribution of an insolvent's estate, without preferences.

Every payment of a debt by a person unable to pay all his debts, whether the payment be made in money or property, tends, in a popular sense, to hinder or delay, or, it may be, even to defeat, other creditors in the collection of their debts, the extent of the effect, whether to hinder, delay or to defeat, depending on the amount of indebtedness and value of the debtor's property; but it has never been held that a payment, either with money or property, by an insolvent debtor, in the absence of a law declaring preferences invalid, was

within the meaning of the law, to hinder, delay or defraud other credit-ors. What it is lawful to do cannot become unlawful by reason of the fact that it is done through a motive, or with an intent, not friendly to all creditors ; a hindrance or delay, which does not operate as a fraud upon other creditors, is not that prohibited by law. Every debtor has the legal right to pay one or more of his just debts with any money or property he has, though, thereby, he withdraws from the reach of other creditors property which they might subject to the payment of their debts, equally just, as has every creditor the legal right to so receive payment, and the right of neither is affected by the fact that the debtor is insolvent.

If, for such a purpose, the debtor conveys to a creditor property at a fair valuation, or sells to some other person for a fair price, to raise money to pay debts, which, by the terms of the sale, the purchaser is bound to see, and does see, is at once appropriated to such purpose, then it cannot be said that the sale, within the meaning of the law, is made to hinder, delay or defraud other creditors who may not receive of the proceeds. In such a case, no obstacle is interposed between the property of the debtor and the right of other creditors to subject his property to the payment of their debts, which, in law, amounts to to a hindrance or delay.

In such a case, it cannot be said that a sale was made "with intent to delay, hinder or defraud creditors, purchasers or other persons of or from what they are, or may be, lawfully entitled." R. S., art. 2465.

To vitiate a sale, the intent of the seller must be to hinder, delay or defraud his creditors, and such intent cannot exist if the purpose be to appropriate the property or its proceeds, at its fair value, to the payment of one or more just debts, in a manner and at time satisfactory to the creditors to be paid. "The notice to the grantee must be a notice of an intent on the part of the debtor to delay, hinder or defraud, in the legal sense of those terms, as used in the statute." If the intended and necessary effect of a transfer be to discharge one or more just debts of the seller by a present application of the full value of the property, in a manner agreed to by the creditors, it would seem that the purchaser would stand on ground as favorable as though he were a purchaser for the sole purpose of securing a debt due to himself.

In the one case, as in the other, the property is applied to the seller's debts—no interest or reservation of benefit is left in the grantor. That is done indirectly which the seller had the right to do, and, in some cases, might not be able to do by a sale directly to the creditor. These matters are illustrated by a number of cases. Ford v. Williams, 3 B.

Monroe 557 ; Brown v. Foree, 7 B. Monroe, 357 ; Gregory v. Harrington, 33 Vt. 241 ; Bedell v. Chase, 34 N.Y. 386 ; Wood v. Shaw, 29 Ill. 444 ; Wheaton v. Neville, 19 Cal. 46 ; Hall v. Arnold, 15 Barb. 600 ; Uhler v. Maulfair, 23 Pa. St. 484 ; Bank v. Carter, 38 Pa. St. 446 ; Johnson v. McGrew, 11 Ia. 152 ; Hartshorn v. Eames, 31 Me. 98 ; Gassett & Co. v. Wilson & Brown, 3 Fla. 258-261 ; Covanhovan v. Hart, 21 Pa. St. 500 ; Dana v. Stanford, 10 Cal. 274 ; Worland v. Kimberlin, 6 B. Monroe 609 ; Bank v. Fitch, 48 Barb. 354 ; Banfield v. Whipple, 96 Mass. 14 ; Giddings v. Sears, 115 Mass. 507 ; Bank v. Nelson, Cold. 189 ; Lowry v. Howard, 35 Ind. 170 ; Wait on Fraud. Conv., sec. 11, p. 390 ; Bump on Fraud. Conv., sec. 21, pp. 205, 206, and citations. No Texas case exists which, read in the light of the facts of the particular case, announces such a rule as is contained in the charges we have considered. Mosely v. Gainer, 10 Tex. 387 ; Edrington v. Rogers, 15 Tex. 195 ; Hancock v. Horan, 15 Tex. 511 ; Greenleve v. Blum, 59 Tex. 126 ; Schneider v. Sansom, 62 Tex. 203 ; Gus Lewy & Co. v. Fischl, 65 Tex. 311.

Fraud or no is ordinarily a question of fact, but, if the facts be admitted, whether they constitute fraud within the meaning of the statute, becomes in many cases a matter of law.

If the facts which the charge asked by the appellants made necessary to the validity of the sale, were, by a special verdict, found to exist, a court might, as a matter of law, hold that the sale to Ellis was not made with intent to hinder, delay or defraud creditors.

The words "hinder" or "delay," used in the charges given at the request of the defendants, were doubtless understood by the jury in the sense in which, from the charges already considered, it was intended by the court and the defendants they should be, and what has already been said renders it unnecessary to consider these charges separately. Some of them, but for their tendency to mislead in the respect already referred to, would have been proper charges, if the facts of the case required such charges, a question which we need not now consider. We deem it proper, however, to say that knowledge by the purchaser that the debtors intended, after paying debts with a part of their property, to apply a part or the whole of the residue to the payment of other just debts, even by way of preferences, would no more vitiate the sale than would the knowledge of the intent to give preferences through the first sale.

The burden of proof was on the defendants to prove the illegality of the sale to Ellis, and the court should have given the charge asked upon this subject. The declarations of Jenkinson, not made in the presence of Ross, Russell or Ellis, and not shown to have been author-

ized by Ross or Russell, should have been excluded. The other assignments need not be considered.

For the errors mentioned, the judgment of the court below will be reversed and the cause remanded.

REVERSED AND REMANDED.

[Opinion delivered February 23, 1886.]