**CENDANT MOBILITY SERVICES CORPORATION, Appellant**

v.

**Kenneth S. FALCONER, Appellee.**

No. 06–03–00023–CV.

Court of Appeals of Texas, Texarkana.

Submitted March 31, 2004.

Decided May 4, 2004.

J. Scott Bardole, Brown & Carls, LLP, J. Woodfin Jones, Alexander, Dubose, Jones & Townsend, LLP, Austin, TX, for appellant.

Jeffery K. Heck, Saunders, Schmidt & Echols, PC, Tyler, John R. Mercy, Mercy, Carter & Tidwell, LLP, Texarkana, TX, for appellee.

Before MORRISS, C.J., ROSS and CARTER, JJ.

## OPINION

MORRISS, Chief Justice.

The Gregg County house purchased by Kenneth S. Falconer turned out to be a nightmare. Falconer purchased the house in 1999 through Cendant Mobility Services Corporation, a relocation firm selling the property for the prior owners, the Gunnelses. After the purchase, and a severe drought, Falconer began to see damage to interior and exterior walls and floors revealing serious and widespread structural flaws.[1] Falconer sued Cendant, asserting causes of action for fraud and violation of the Texas Deceptive Trade Practices–Con-

---

1. At trial, Falconer testified and produced video footage of cracks above and below doors and windows, plasterboard cracked from floor to ceiling, and places where the cracks were large enough to split wallpapered areas all the way down to the floor. Falconer also described numerous cracks in the house's exterior bricks and mortar, the warping and splitting of rafters along with the subsequent damage to the roof and gutters, and the almost complete separation of the chimney from the rest of the house.

sumer Protection Act (DTPA), Tex. Bus. & Com. Code Ann. §§ 17.41–.63 (Vernon 2002 & Supp.2004), claiming that Cendant failed to disclose that the house's foundation had shown evidence of substantial movement in the past and that Cendant provided only a portion of the relevant engineer's report for his review.[2] The evidence reveals, however, that Falconer's initials appear on each page of the previous homeowner's real estate disclosure ("Gunnels Disclosure") and an engineer's structural inspection report ("Downs Report").

Finding that Cendant committed fraud and violated the DTPA, a Gregg County jury found in Falconer's favor $32,000.00 in damages, $100,000.00 in additional damages, $150,000.00 in exemplary damages, and $41,184.13 in attorney's fees. In its final judgment, the trial court eliminated the exemplary damages award, ordered the sales contract rescinded, and awarded Falconer a total recovery of $234,619.09.[3] Cendant now appeals, challenging the legal and factual sufficiency of the evidence and contending the trial court erred in calculating prejudgment interest before applying Cendant's settlement credit and in awarding additional damages under the DTPA in excess of the statutory maximum. We reverse the trial court's judgment and render judgment that Falconer take nothing.

*Reviewing Evidentiary Sufficiency*

When reviewing a challenge to the legal and factual sufficiency of the evidence, we apply two separate standards. In evaluating legal sufficiency, we consider all of the evidence and any reasonable inferences in the light most favorable to the prevailing party and determine whether the evidence as a whole rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Associated Indem. Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 285–86 (Tex.1998); *Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 25 (Tex.1994). We disregard all direct and circumstantial evidence contrary to the finding, *Lenz v. Lenz,* 79 S.W.3d 10, 13 (Tex.2002), requiring the party attacking the legal sufficiency to demonstrate on appeal that there is no evidence to support it, *Croucher v. Croucher,* 660 S.W.2d 55, 58 (Tex.1983). We will sustain such a challenge only when the record discloses: (1) a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence, or (4) the evidence established conclusively the opposite of a vital fact. *Merrell Dow Pharms. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997) (citing Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 Tex. L. Rev. 361, 362–63 (1960)).

In evaluating factual sufficiency, we consider all of the evidence, including any evidence contrary to the verdict. *Mar. Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406–07 (Tex.1998); *Plas–Tex, Inc. v. U.S. Steel Corp.,* 772 S.W.2d 442, 445 (Tex. 1989). The jury itself is the sole judge of witness credibility and the weight to be given testimony, *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex.1986);

---

**2.** Falconer does not contend Cendant sold the house with a defective foundation; instead, he focuses on Cendant's alleged failure to disclose the information it possessed at the time of sale.

**3.** In addition to ordering rescission of the sales contract, requiring Cendant to reimburse Falconer the $82,178.12 sales price plus settlement charges, the trial court ordered Cendant to pay Falconer $100,000.00 in additional damages, $41,184.13 in attorney's fees, and $21,506.84 in prejudgment interest. Cendant was, however, given a settlement credit in the amount of $10,250.00.

however, when a party without the burden of proof on an issue challenges the factual sufficiency of the evidence, the question on appeal is whether the evidence sufficiently supports the jury's conclusions, *Gooch v. Am. Sling Co.*, 902 S.W.2d 181, 184 (Tex. App.—Fort Worth 1995, no writ). That is, as long as there is enough evidence before the fact-finder so that reasonable minds could differ on the meaning of the evidence, or the inferences and conclusions to be drawn from the evidence, it will be deemed factually sufficient. We will, however, sustain a factual sufficiency challenge if the evidence is so weak or the verdict is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965).

*The Evidence in This Case*

■ Falconer's case is based on allegations that Cendant failed to disclose that the house's foundation showed evidence of substantial movement (as opposed to minor settlement) in the past and that Cendant failed to provide a complete copy of the relevant engineer's report. He contends Cendant's actions were false, misleading, and deceptive, constituted the producing cause of his economic damages, and were unconscionable. *See* Tex. Bus. & Com. Code Ann. § 17.50(a)(1), (3) (Vernon 2002). Essentially, Falconer argues he was misled by Cendant's agent because she only pointed out what she considered to be the important parts of the homeowner's real estate disclosure and the structural inspection report before he signed the contract, agreeing to buy the house. The evidence, however, does not support this conclusion.

Before Falconer ever made an offer on the house in question, Cendant's agent provided him with a copy of the Gunnels Disclosure and a copy of the Downs Report. The Gunnels Disclosure noted minor settlement had occurred, but that concrete piers were installed to minimize additional movement of the foundation. The Downs Report further explained:

> *The foundation shows evidence of a substantial amount of movement in the past. There is a significant separation in the brick veneer mortar joints on the right exterior wall approximately 12 ft. from the left front corner of the house. There are other minor cracks in the exterior and interior walls of the house.* According to a report by a registered engineer ... approximately 23 underpin piers were installed around the perimeter of the house to prevent and minimize foundation movement. It is my opinion that these foundation underpins have been successful in minimizing foundation movement and the cracks and separations that I observed, for the most part, existed prior to the installation of the piers. It is my opinion that the foundation is now in a stable condition and the house is structurally sound. Additional repairs or stabilization work is not warranted.

(Emphasis added.) Despite Falconer's admission that he received and initialed at least those portions of the documents describing the foundation's condition, he nevertheless maintains that he was misled by Cendant's agent. He testified he would not necessarily characterize what she affirmatively told him about the house as a misrepresentation of the information available to her, but believed she misled him by selectively informing him of certain portions of the Gunnels Disclosure and the Downs Report, omitting the fact that substantial movement had taken place in the past. Instead, she reportedly pointed out from the Gunnels Disclosure only that minor settlement had occurred in the past and then jumped forward to the last two sentences of the Downs Report quoted

above, indicating that the foundation was stable, that the house was structurally sound, and that no additional repairs were warranted.

The following testimony paints Falconer's perspective.

Q   So you may have seen [the Downs Report], but you just didn't read everything?

A   That's possible.

Q   Isn't it true, sir, that when you initial or sign something that you're making a representation to someone that you received the document, you read the document. You approve the document, understood the document. Is that not what initials and signatures are for?

A   That may be legally what they're for, but like I said, we went through it and she pointed things out and said initial it and I initialled them when she went through them.

Q   Well, why would you initial something?

A   Because she told me to.

Q   So you just blindly initialled it when she told you to?   .

A   Well, I relied on her to point out things that were important.

Q   When you sign something are you not saying that you've read it, reviewed it, and approved it?

A   Well, I rely on people—a real estate agent to point out what's important.

In earlier testimony, Falconer explained:

A   I think there is a difference in receiving [documents] and having somebody go over them with you and say, you know, this is what it says right here. Would you initial it please. I initial it.

Q   .... You're trying to tell the ladies and gentlemen of this jury as a first time home buyer you didn't read those reports in their entirety?

A   Well, I relied on the real estate agent to tell me what was in those reports.

Q   So you're telling the ladies and gentlemen of the jury that you did not read these?

A   I did not read everything on every page.

Q   If you've initialled something what do you think that implies to folks who are looking at those documents later?

A   That I had seen it.

. . . .

Q   You were present during the deposition of Sheila Manning weren't you?

A   Yes.

Q   She was the Realtor involved in your sale; is that right?

A   Yes.

Q   You heard her testify that she gave you the entire Downs report ... before you made an offer on this house; is that right?

A   Yes.

Q   And you also heard her testify that she gave you those and told you to go home and read all of them yourself before she would submit the offer to Cendant?

A   That may be, but again I didn't read everything on every page.

. . . .

Q   You heard Ms. Manning testify she gave you those complete reports to go home and read. She had you come back and initial them as having read them and now you're telling the jury that you never read them?

A   I didn't read every word.

Q   And that's Cendant's fault that you didn't read every word?

A   No. It's not Cendant's fault.

Q Do you expect Cendant to sit down and read each—the contract through line by line with you?

A If that's what it takes.

■ Despite Falconer's belief that Cendant's agent should have explained every detail of the contract, including any disclosures or attached reports, this is simply not the law. Even where there exists a fiduciary relationship—which we do not have here—there is no duty under the DTPA requiring sellers to orally disclose the contents of a written contract. *See First City Mortgage Co. v. Gillis*, 694 S.W.2d 144, 146–47 (Tex.App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.). The information provided in the Gunnels Disclosure and the Downs Report was clear and unambiguous and subject to Falconer's review before signing. "It is well settled that the parties to a contract have an obligation to protect themselves by reading what they sign. Unless there is some basis for finding fraud, the parties may not excuse themselves from the consequences of failing to meet that obligation." *Id.* at 147; *Amouri v. Southwest Toyota, Inc.*, 20 S.W.3d 165, 169 (Tex. App.—Texarkana 2000, pet. denied) ("[E]very person [with legal] capacity . . . is held to know what words were used in the contract, to know their meaning, and to understand their legal effect.").

■ While the exception to this rule will excuse even negligence in failing to read a contract before signing, the exception applies only where one party's false representations induce another party to contract. *Id.* at 170–71 (citing *Plains Cotton Coop. Ass'n v. Wolf*, 553 S.W.2d 800, 803 (Tex.Civ.App.—Amarillo 1977, writ ref'd n.r.e.)). In this case, there is no evidence of fraud; Falconer himself declined to characterize Cendant's explanation of the relevant documents as a misrepresentation. Cendant's agent did not conceal any pertinent information from Falconer; in fact, she disclosed in written form all of the information she had regarding the house's foundation, and her oral explanations did not contradict the written disclosures. Not only did Cendant effectively put Falconer on notice that there had been prior settlement affecting the house's foundation, but it also informed him that, to the best of its knowledge, any resulting problems had since been resolved.[4]

Falconer also complained at trial that Cendant failed to disclose the first two pages of the Downs Report. Although these pages contained no information relevant to the foundation settlement question earlier addressed (that information being found on page five of the Downs Report), Falconer maintains he would not have relied on the report had he seen these pages because they indicated the report was not intended for the use of prospective buyers. If he had known that he was not meant to rely on the report, he could have at least made the decision to hire another engineer or walk away from the deal altogether. As with his first claim, however, the evidence does not support the conclusion that Cendant failed to furnish Falconer with the complete report.

■ Although Falconer testified that pages one and two of the report were

4. It is worth noting Cendant also provided Falconer with another engineering evaluation ("Graham Evaluation") in which the engineer inspected and noted defects in the brick veneer wall and the performance of the foundation. Similar to the Downs Report, the Graham Evaluation noted damage to the house, indicating that there had been problems with the foundation in the past, but concluded that any problems were apparently corrected by the installation of piers. No repairs were recommended. Also, although not an engineer, the house inspector hired by Falconer noted in his report that evidence of settlement was evident, but that he did not find any evidence of an ongoing foundation problem.

missing when he signed the earnest money contract, he later admitted he initialed these pages—along with all of the other pages in the report—before purchasing the house. On cross-examination, Falconer testified as follows:

Q Take it back there and let's look at the U.S. Inspect structural evaluation. I'll flip it back there for you. Looking at the original, is that your initials on the bottom of that page?

A It appears to be my initials.

Q Well, you know your initials don't you? Those are your initials aren't they?

A It appears to be.

Q This is the page that has the report is [sic] intended for use of our relocation clients only right?

A Right.

Q You initialled that?

A It appears that I initialled it.

Q If you look at page two, the next one. Again, this is blue ink, right?

A It's blue ink.

Q And that's what you signed all these documents in, blue ink. All earnest money contracts. Well, let's take a look. There is your signature, blue I think, right. He's [sic] is page two here, this is the page that says the structural inspection. Relocation clients are not intended—for use of perspective [sic] buyers or any interested party whatsoever is that right? That's what that says?

A Yes.

Q This is the page [you] contend you didn't get right?

A I didn't read it in its entirety.

Q But you initialled it?

A I initialled it.

. . . .

Q No. I'm not trying to trick you or anything I just want to get in the record that you did initial—you initialled all the pages of the Downs report right? One, two, three, four, five, and six. You initialled all those pages?

A Yes.

. . . .

Q One last question. If Sheila Manning says that she gave you the complete report that I've marked as Defendant's Exhibit No. 1, which is the colored copied one. If she said she gave you that complete report and that you signed, initialled it and gave it back to her, you have no reason to disagree with that would you?

A I have no reason to disagree that she might have given it to me and I initialled it, but I don't ever remember reading over it.

The failure of one party to read a contract, or any of the materials appertaining to it, however, does not equate with a failure of the other party to disclose the information contained within the four corners of that contract. Absent a showing Cendant misrepresented the information disclosed in written form, Falconer was obligated to protect himself by reading the contract. He cannot now be excused from the consequences of failing to meet that obligation. *See Gillis,* 694 S.W.2d at 147; *Amouri,* 20 S.W.3d at 169.

*Conclusion*

Reviewing the evidence in the light most favorable to Falconer, we conclude there is no evidence showing Cendant failed to disclose any information in an attempt to fraudulently induce Falconer to contract. On the contrary, the evidence conclusively establishes Cendant disclosed all matters material to Falconer's claims. Because there is no evidence to support the jury's findings, we reverse the trial court's judg-

ment and render judgment that Falconer take nothing.