

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

---

No. 06-19-00002-CV

---

ROBERT YORK PETTIT, JEFFREY YORK PETTIT, INDIVIDUALLY AND
AS TRUSTEE OF THE BIG HORN PHALANX TRUST, JOSEPH AUSTIN PETTIT
AND EMILY ANNE PETTIT COVEY, Appellants

V.

MARILYN EILEEN PETTIT TABOR, Appellee

---

On Appeal from the 8th District Court
Delta County, Texas
Trial Court No. 10985

---

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Chief Justice Morriss

## MEMORANDUM OPINION

Marilyn Eileen Pettit Tabor (Lyn) conveyed her undivided one-half interest in a family farm and a joint bank account to her brother, Robert York Pettit (Bob), based on his promise to protect the property and to reconvey it to her. When Bob refused to reconvey the property and instead conveyed it to his children, who later conveyed it to The Big Horn Phalanx Trust (the Trust), Lyn sued Bob, his children, and the trustee of the Trust (collectively Appellants) for a return of the property. The trial court found that Bob had breached an informal fiduciary relationship and had committed common law and statutory fraud, voided all of the conveyances of Lyn's one-half interest, imposed a constructive trust on the property, ordered Appellants to reconvey the property to Lyn, and awarded Lyn damages, exemplary damages, and attorney fees.

In this appeal, Appellants assert that the trial court erred in imposing a constructive trust because any recovery by Lyn was barred by the affirmative defense of illegality and because the evidence was legally and factually insufficient to support the trial court's finding of an informal fiduciary relationship, that the award of exemplary damages was not supported by clear and convincing evidence, that Lyn was not entitled to attorney fees, and that the evidence was legally and factually insufficient to support the trial court's findings that the conveyances to Bob were not gifts. Because (1) no illegality bars a constructive trust, (2) Bob's actual fraud supports a constructive trust, (3) exemplary damages are supported by the evidence, (4) attorney fees are supported by the evidence, and (5) Appellants' challenge to the no-gift conclusion was forfeited, we affirm the judgment of the trial court.

*(1)     Background*

*A.       The Family Farm and the Pettit Siblings*

The family of Margaret Eileen Pettit (Margaret), Lyn and Bob's mother, had owned a 280-acre tract and a 34.5-acre tract of land in Hunt County (the Hunt Tracts) since 1903. Margaret had owned them since 1947. At some point, Margaret also acquired a 70-acre tract in Delta County (the Delta Tract).[1] In 1951, Margaret and her husband built a house on the Hunt Tracts, where the family lived for some time. Around 1960, the family moved to Waco, where Lyn and Bob graduated high school. A few years later, Lyn got married to her first husband and moved to New Mexico, where she eventually began a mortgage brokerage business, Pettit Mortgage. Bob became an ordained minister, but has worked as a petroleum landman for the last forty years

In 2001, Lyn moved back to Waco. There, her relationship with both Margaret and Bob became closer, their families began spending holidays together, and Bob performed the wedding of Lyn and her current husband, Johnny. She also started going to the Family Farm with Margaret and began spending weekends there. Eventually, Bob and his family also began using the Family Farm. In 2003, the house on the Family Farm was in disrepair, and Lyn's husband, Johnny, did some repairs to get it in shape for family functions. Sometime later, they began having family functions with Bob's family on holidays and extended weekends. Bob and his sons helped Johnny with the maintenance and improvements on the Family Farm. Both families engaged in hunts for deer and hogs and other outdoor activities at the Farm.

---

[1] Hereinafter, the Hunt Tracts and the Delta Tract, collectively, will be referred to as "the Family Farm" or "the Farm."

As Margaret aged, Lyn and Bob worked closely together to deal with her and the issues that arose. In 2006, Margaret conveyed the Family Farm to Lyn and Bob by warranty deeds and reserved a life estate to herself. Because of his forty years of experience and knowledge regarding the transfer of property interests, Bob drafted those warranty deeds, as well as other deeds for the family. When they became owners of the property, if something needed to be done, either Lyn or Bob would take care of it.

Lyn testified that she loved Bob, that she had trusted him implicitly, and that there was nothing she could not trust him with. When Margaret died in 2009 and her life estate terminated, she left Lyn $60,000.00 to $80,000.00 in a pay-on-death account. Lyn used some of that money to rehabilitate Margaret's residence, and Bob, the executor of Margaret's estate, told her she would be reimbursed from the estate. Bob wanted to put a stock pond on the Farm, so another $25,000.00 of that money was spent to do so. Lyn also agreed to put the rest of the money in a joint bank account to be used for the management of the Farm, taxes, utilities, and repairs. Bob and Lyn were both authorized signatories on the account.

Bob acknowledged that Lyn trusted him enough to make him a signatory on the account and that they worked together to do the things that needed to be done at the Family Farm. He also agreed that the Family Farm was important to him, Lyn, and their families and that he and Lyn had talked about wanting to pass it down to their respective heirs. Bob acknowledged that he knew that this was important to Lyn.

Bob's wife, Sharon, testified that, based on Bob and Lyn's relationship, Lyn trusted Bob implicitly. She believed that, based on their relationship and Bob's dealings with Lyn, Lyn

4

believed as truth anything Bob told her and trusted him to do what he promised. She also agreed that Bob took the lead in the management and running of the Farm, but also testified that it was "kind of" mutual.

   B.     *Lyn's Transfer to Bob*

In late March 2013, Lyn called Bob to ask for his help in conveying her interest in the Family Farm to her children, Darrin and Casey. The substance of that conversation was disputed at trial. According to Lyn, she had had two heart surgeries, including one in January 2013 to replace her pacemaker. This made her consider her mortality and accelerated her timeline for transferring the Farm to her children. In early 2013, she received notice that a hearing was scheduled in a New Mexico lawsuit against Pettit Mortgage, although she thought it had been settled several years before. This prompted her to hire an attorney to help resolve the lawsuit and to feel more urgency in conveying the Farm to her children. Lyn testified that she was a little concerned about the lawsuit because she was not familiar with legal matters but that she did not think she had any liability.[2] She also testified that, at the time, she did not have any creditors or any outstanding judgments and that she had about $150,000.00 in liquid assets.

When she called Bob to let him know she wanted to transfer her interest to her children, she also mentioned the lawsuit and the upcoming hearing. Bob proceeded to tell her about a lawsuit he was in at the time, about how horrible the depositions and discovery were and about the attorney fees, the time, the stress, and all the things involved in a lawsuit. He told her that he did

---

[2]The New Mexico lawsuit involved a cross-claim filed by Amy Downey against several entities, including Pettit Mortgage. Although the heading of the cross-claim listed "Pettit Mortgage" as one of the cross-defendants, the body of the cross-claim identified the entity being sued as "Pettit Mortgage, Inc. . . . a New Mexico Corporation."

5

not think her children could handle a lawsuit and that she should transfer her interest to him instead. Bob also promised her that he would transfer the property back as soon as the lawsuit in New Mexico was settled, and he told her, "[R]ight now we have to protect the farm and circle the wagons." Lyn testified that, though she had originally intended to transfer her interest to her children, Bob convinced her that that would trouble her children, unless she transferred it to Bob instead. He also made it clear that it would only be temporary and that he would transfer it back.

Lyn also testified that, since Bob was her big brother and she had always trusted his judgment, he scared her with the possibility that the New Mexico legal issue might be bigger than she had thought. Based on their relationship, she felt she could trust him at his word, and she became convinced that his way was a better way to go. She testified that she never intended to make a gift of her interest to Bob and that she would never have conveyed it to him outright.

According to Bob, Lyn told him that her attorney had recommended that she get all her assets out of her name and that there had been a judgment against her. She told him that she was going to convey her interest in the Family Farm to her children, but that he "educated" her about a different option. He told her that he had been in lawsuits, that lawsuits were terrible, and that her children did not need this property. He also told her that the lawsuit in New Mexico might end up being a big deal, that it would drag her children into it, and that they would not be able to handle it. He then told her that she would be much better off transferring it to him because he would be able to handle it better. Bob testified to telling Lyn that he was far more capable of mounting a robust defense, that he already had a legal team in mind, and that Lyn agreed. He also testified that he told Lyn that a New Mexico judgment could jeopardize the Farm and that Lyn understood

6

the threat. He maintained that Lyn told him that she had a judgment against her[3] and that she was afraid the property interest would be seized.

Bob denied that he told her he would convey the property back to her; in fact, he affirmed that, at the time of this transaction, he had no intent to convey it back to her. He also denied that Lyn had ever proposed that it would be a temporary conveyance. Rather, he maintained that he had made it very clear that he would not be returning her interest. Nevertheless, tellingly, Bob admitted that, by the end of their conversation, he had left Lyn with the impression and understanding that her children would end up owning her interest, even though he never intended for that to be the case.

At trial, Bob limited the extent to which it was reasonable for Lyn to have a very high degree of trust and confidence in him at the time of this transaction. In his deposition, however, when pressed on whether Lyn should have had a high level of trust and confidence in him and his dealing with her at the time of this transaction, Bob answered unequivocally in the affirmative.

Within a few days of their conversation, Bob prepared and delivered to Lyn proposed warranty deeds that would transfer Lyn's interest in the Family Farm to him. On April 1, he drove from his home in San Antonio to Waco and accompanied Lyn to execute the deeds and have them notarized. Bob left the effective date of the deeds blank and discussed backdating the deeds with Lyn. According to Bob, he suggested backdating the deeds a week or two, but Lyn wanted to backdate them to October 24. Lyn testified that Bob suggested backdating them to a date before

---

[3]Bob also testified that he had not seen, or been able to find, a judgment against Lyn or Pettit Mortgage.

7

the court hearing, but she did not know how they picked October 2012. After the deeds were executed, Bob drove that same day to file them in Hunt and Delta Counties.

Within two or three days, Bob prepared and sent Lyn correction deeds that added language that Lyn was conveying the property to Bob "without any restrictions, limitations, reservations or conditions whatsoever." Bob explained that he added this language so that nobody could argue it was a fraudulent transfer. Although Bob testified that he explained this to Lyn, Lyn testified that he told her that he added only language about "love and affection" because of tax ramifications and to make it look permanent.

### C.    *Bob Refuses to Reconvey*

In May or June 2013, Lyn went to New Mexico with her attorney and settled the lawsuit against her company for $6,000.00. She explained that this was a business decision, reasoning that settling cost less than litigating the case. There was no court hearing and no judgment entered against her or her company. Lyn testified that she paid the settlement and her attorney fees of $4,000.00 out of her liquid assets. The same day the settlement was signed, Lyn called Bob to tell him of the settlement and asked him to get the paperwork started to get her interest in the Farm back in her name. Bob suggested that they needed to wait on reconveyance until she had a signed dismissal order and knew it was final. Bob confirmed that he had requested a signed dismissal order, but denied that Lyn said anything about getting her interest back. An order dismissing Pettit Mortgage, Inc., was filed in the New Mexico case July 24, 2013.

When Lyn received a copy of the dismissal order from her attorney, she sent an email to Bob on September 10, 2013, advised him that the case had been formally dismissed, and asked

8

him to prepare the deeds to convey her interest in the Farm back to her. Bob did not respond to that email, and he avoided her telephone calls for about a month. When Bob finally answered one of her calls, she told him it was time to have the property put back in her name. Bob responded that she should not worry about that, that he would take care of everything, and that she should go out and enjoy the Farm. Lyn continued to press him, and eventually he told her he was not going to convey the property back to her. When she insisted that he tell her why, he told her that it was because she had threatened him. He told her that, in a November 2012 telephone call, she had told him that she did not have to agree with everything that dealt with the Farm.[4] He also told her that he had talked to some attorneys who said he should not reconvey the property so close in time. Lyn testified that Bob never denied having agreed to convey the property back to her in that conversation.

Bob maintained that he told Lyn in that conversation that he was not going to reconvey the property and that he had never agreed to do so. But he affirmed that his first written denial of any agreement to reconvey did not come until two years later, September 22, 2015. Between October 2013 and filing this suit in May 2016, Lyn made several written, telephonic, and in-person efforts to resolve this matter and to get her interest in the property conveyed to either her or her children. Bob either failed to respond to those efforts or rebuffed her overtures.

Jimmy Caradine, an owner of property close to the Hunt Tracts, testified that he had been friends with Bob. At some point, Bob told him that Lyn had conveyed her interest in the Farm to

---

[4]The November 2012 telephone call arose when Lyn and Casey found out that Casey's ex-husband, Justin, had been allowed to come to the Family Farm, even though Lyn had requested that Bob not permit Justin on the property. Apparently, Emily and her husband, who were friends with Justin, had allowed him to come to the Family Farm.

9

him to protect it from a problem she had but that, when the problem got cleared, Bob would give it back. Caradine was surprised when he found out later that Bob was not going to give the property back to Lyn.

Lyn did not initially know that, shortly after she conveyed her interest to Bob, Bob conveyed all of the minerals in and under the Family Farm to Pettit International, a sole proprietorship owned by Bob. About two weeks after receiving Lyn's September 2013 email, Bob conveyed all of the minerals in and under the Family Farm to his son, Joseph, as trustee of the Minerals Management Trust, a trust newly created by Bob. In that same time period, Bob conveyed the Family Farm to his children, Jeffrey, Joseph, and Emily, reserving a life estate to himself. Shortly before Lyn filed this lawsuit, the Family Farm and all its minerals were conveyed to Jeffrey, as trustee of the Big Horn Phalanx Trust. Joseph testified that they conveyed the Family Farm and its minerals to the Big Horn Phalanx Trust to protect it from external threats, specifically from Lyn.

### D.  *Procedural Background*

Lyn filed suit against Bob, his children, and Jeffrey, as trustee of the Big Horn Phalanx Trust, and sought a judgment for actual or constructive fraud, the imposition of a constructive trust, a declaratory judgment that the conveyances of her fifty percent undivided interest in the Family Farm were void, the imposition of a resulting trust, damages, and attorney fees. All of the Appellants entered a general denial and pled affirmative defenses, including illegality. After a bench trial, the trial court entered judgment for Lyn in which it:

10

1. Declared the transfers of Lyn's fifty percent undivided interest in the Family Farm to Bob, and all subsequent transfers of that interest void because of the fraud of Bob;

2. Imposed a constructive trust for Lyn's fifty percent undivided interest in the Family Farm;

3. Ordered Appellants to do all that is necessary to reestablish and/or reconvey Lyn's fifty percent undivided interest in the Family Farm;

4. Entered judgment for Lyn against Bob in the amount of $20,000.00 for her fifty percent interest in the joint Family Farm account;

5. Awarded Lyn $50,000.00 in exemplary damages because Bob intentionally and maliciously committed common law and statutory fraud; and,

6. Awarded Lyn $43,084.39 reasonable and necessary attorney fees and $5,924.37 for reasonable and necessary costs, pursuant to Sections 37.001, et seq., and 27.01 of the Texas Business and Commerce Code.

The trial court also entered findings of fact and conclusions of law at Lyn's request. No Appellant requested additional or amended findings of fact and conclusions of law.

*(2) No Illegality Bars a Constructive Trust*

As we construe the Appellant's brief, they asserts that the trial court abused its discretion in imposing a constructive trust because the trial court failed to correctly apply the law and because the imposition of a constructive trust was not supported by factually and legally sufficient evidence. We conclude that no illegality bars a constructive trust because (A) sufficient evidence supports the finding that Downey[5] was not Lyn's creditor and (B) the trial court's conclusion that the illegality defense was not available is not reversible error.

---

[5]Downey was the plaintiff in the New Mexico lawsuit.

11

The trial court's imposition of a constructive trust, as an equitable remedy, is reviewed for an abuse of discretion. *Baker Botts, L.L.P. v. Cailloux*, 224 S.W.3d 723, 736 (Tex. App.—San Antonio 2007, pet. denied); *see Wilz v. Flournoy*, 228 S.W.3d 674, 677 (Tex. 2007) (reviewing imposition of constructive trust for abuse of discretion). A trial court abuses its discretion when its "ruling is arbitrary and unreasonable, made without regard for guiding legal principles or supporting evidence," or "when it fails to analyze or apply the law correctly." *In re Nationwide Ins. Co. of N. Am.*, 494 S.W.3d 708, 712 (Tex. 2016) (orig. proceeding) (citing *Ford Motor Co. v. Garcia*, 363 S.W.3d 573, 578 (Tex. 2012); *In re Sw. Bell Tel. Co.*, 226 S.W.3d 400, 403 (Tex. 2007) (orig. proceeding)).

A constructive trust is "a creation of equity to prevent a wrongdoer from profiting from her wrongful acts." *Gray v. Sangrey*, 428 S.W.3d 311, 315 (Tex. App.—Texarkana 2014, pet. denied) (citing *Procom Energy, L.L.A. v. Roach*, 16 S.W.3d 377, 381 (Tex. App.—Tyler 2000, pet. denied)). A constructive trust subjects the person who holds title to property "to an equitable duty to convey it to another, on the ground that his acquisition or retention of the property is wrongful and that he would be unjustly enriched if he were permitted to retain the property." *Cailloux*, 224 S.W.3d at 736 (quoting *Talley v. Howsley*, 176 S.W.2d 158, 160 (Tex. 1943)). "To obtain a constructive trust, the proponent must prove (1) the breach of a special trust, fiduciary relationship, or actual fraud, (2) unjust enrichment of the wrongdoer, and (3) tracing to an identifiable res." *Gray*, 428 S.W.3d at 315 (citing *Troxel v. Bishop*, 201 S.W.3d 290, 297 (Tex. App.—Dallas 2006, no pet.)).

The Appellants complain that the trial court incorrectly applied the law, even though they had established their affirmative defense of illegality. They contend that the conveyance of Lyn's interest in the Family Farm to Bob was made by Lyn with the intent to defraud or hinder her creditor in the New Mexico lawsuit. They rely on the rule that bars enforcement of an agreement to reconvey.

> A grantor who conveys his property for the purpose of shielding the property from liability to future creditors, when the purpose of such a conveyance is not to divest the grantor of beneficial interest, should not receive the aid of the courts against his grantee. Public policy considerations demand that we refuse equitable relief and leave the parties where they have placed themselves.

*In re Marriage of Parker*, 997 S.W.2d 833, 838 (Tex. App.—Texarkana 1999, pet. denied) (citations omitted).

Since whether the trial court correctly applied the law is dependent on what facts were adduced at trial, we will first address whether there was sufficient evidence supporting the trial court's findings on the Appellants' affirmative defense. Because it is an affirmative defense, the party asserting illegality has the burden "to present sufficient evidence to establish the defense and obtain the requisite . . . findings." *Philadelphia Indem. Ins. Co. v. White*, 490 S.W.3d 468, 486 (Tex. 2016) (quoting *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 156–57 (Tex. 2015)).

When there is an assertion by a defendant that an agreement to reconvey property should not be enforced because the original conveyance was made with the intent to defraud present or future creditors, Texas courts have long held that to prevail on this defense, it must be shown both that the plaintiff intended to defraud or hinder her creditor and that there was a present or future creditor who would be injured by the conveyance. *See Rivera v. White*, 63 S.W. 125, 126 (Tex.

13

1901) (agreement to reconvey enforceable when no potential creditor shown); *Cordova v. Lee*, 14 S.W. 208, 209 (Tex. 1890) (agreement to reconvey enforced when no proof of a creditor at the time of the conveyance); *Harmon v. Schmitz*, 39 S.W.2d 587, 590 (Tex. Comm'n App. 1931) (intent to defraud unimportant when there is no creditor to defraud); *Wells v. Jamison*, 252 S.W. 1023, 1025 (Tex. Comm'n App. 1923, judgm't adopted) (policy barring enforcement of agreement to reconvey not applicable where there are in fact no creditors); *Stout v. Clayton*, 674 S.W.2d 821, 826–27 (Tex. App.—San Antonio 1984, writ ref'd n.r.e.) (agreement to reconvey enforced when no showing of intent to defraud and no actual creditor shown); *White v. White*, 519 S.W.2d 689, 693 (Tex. App.—San Antonio 1975, no writ) (policy barring enforcement of agreement to reconvey not applicable when no actual creditor shown, irrespective of motivation); *Barber v. Coleman*, 173 S.W.2d 660, 664 (Tex. App.—Galveston 1943, writ dism'd) (same).

In regard to the requirement that a creditor must be shown, the Texas Supreme Court explained, "The [fraudulent transfer] statute does not prohibit conveyances by persons who are not indebted, and no policy of the law is thwarted by a mere motive which cannot work injury to creditors."[6] *Rivera*, 63 S.W. at 126 (citing *Ellis v. Valentine*, 65 Tex. 532, 547 (1886)).

---

[6]The current statute prohibiting fraudulent transfers is consistent with this statement and provides, as applicable to this case:

> (a)     A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> > (1)     with actual intent to hinder, delay, or defraud any creditor of the debtor[.]

TEX. BUS. & COM. CODE ANN. § 24.005. A "creditor" is defined as "a person . . . who has a claim." TEX. BUS. & COM. CODE ANN. § 24.002(4) (Supp.). A "'[c]laim' means a right to payment or property, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." TEX. BUS. & COM. CODE ANN. § 24.002(3) (Supp.).

14

Although the trial court's findings of fact and conclusions of law may lack precision, a fair reading of its findings[7] is that it found both that Lyn lacked the requisite intent to defraud the plaintiff in the New Mexico suit[8] and that no creditor of Lyn had been shown to exist.[9] Appellants have challenged the factual and legal sufficiency of the evidence supporting those findings.

*(A)        Sufficient Evidence Supports the Finding that Downey Was Not Lyn's Creditor*

First, we address the sufficiency of the evidence to support the trial court's finding that Downey was not Lyn's creditor.

"In reviewing a legal sufficiency complaint of an adverse finding on which the appellant did not have the burden of proof, the appellant must demonstrate on appeal that no evidence supports the adverse finding." *Monasco v. Gilmer Boating & Fishing Club*, 339 S.W.3d 828, 830 (Tex. App.—Texarkana 2011, no pet.) (citing *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983); *Cendant Mobility Servs. Corp. v. Falconer*, 135 S.W.3d 349, 351 (Tex. App.—Texarkana 2004, no pet.)). Such a challenge will be sustained only on a record that shows

---

[7]"[F]indings of fact and the conclusions of law will be construed together; and if the findings of fact are susceptible of different constructions, they will be construed, if possible, to be in harmony with the judgment and to support it." *Gulf Liquid Fertilizer Co. v. Titus*, 354 S.W.2d 378, 385 (Tex. 1962).

[8]In her brief, Lyn points to the trial court's findings of fact numbers 4, 5, and 6 in which the trial court found that Lyn had originally intended to convey her interest in the Family Farm to her children, that her cardiac problems and contemplating her own mortality had prompted her to do so sooner, that she had called Bob to assist her in the paperwork to do so, and that Bob had engaged in scare tactics to convince her to convey her interest to him to safeguard it from a potential creditor in the New Mexico suit. We also note that the trial court found that Bob "lied about the gravity of the situation and the need to 'hide' property from the lady who had sued [Lyn's] company, convincing her that she might be personally liable for a judgment debt of her company." These findings can be reasonably construed to be a finding that Lyn did not have the requisite intent to defraud her creditors. *See, e.g.*, *White*, 519 S.W.2d at 693 ("[T]he unjustified fears of appellee regarding her property were largely based on the fraud and overreaching of [appellant] while ostensibly acting as her advisor.").

[9]In its findings, the trial court characterized the pending New Mexico lawsuit as being against Lyn's company, Pettit Mortgage, not against Lyn personally. This supports an implied finding that the plaintiff in the New Mexico lawsuit was not Lyn's current or future creditor.

15

> (1)     a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence; or (4) the evidence established conclusively the opposite of a vital fact.

*Id.* (citing *Merrell Dow Pharms. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)).  "If the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about a vital fact's existence, more than a scintilla of evidence exists." *Id.* (citing *Burroughs Wellcome v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995)).

"When a party attacks the legal sufficiency of the evidence supporting an adverse finding on an issue on which she has the burden of proof, she must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam) (citing *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989)).  To prevail on appeal, the party must first show that no evidence supported the trial court's finding and then, if there was none, that the evidence conclusively established the finding urged by the party. *See PlainsCapital Bank v. Martin*, 459 S.W.3d 550, 557 (Tex. 2015) (citing *Dow Chem. Co.*, 46 S.W.3d at 241).  To determine whether no evidence supported the finding, we "first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary." *Dow Chem. Co.*, 46 S.W.3d at 241 (citing *Sterner*, 767 S.W.2d at 690).  If no evidence supports the finding, then we "examine the entire record to determine if the contrary proposition is established as a matter of law. *Id.* (citing *Sterner*, 767 S.W.2d at 690).  "Evidence is conclusive only if reasonable people could not differ in their conclusions, a matter that depends on the facts of each case." *Id.* (quoting *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)).

"When a party attacks the factual sufficiency of an adverse finding on an issue on which she has the burden of proof, she must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence." *Id.* at 242 (citing *Croucher*, 660 S.W.2d at 58). We "consider and weigh all of the evidence," and we "can set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *Id.* (citing *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986)). If we set aside the verdict, we "must 'detail the evidence relevant to the issue' and 'state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict.'" *Id.* (quoting *Pool*, 715 S.W.2d at 635)).

"When challenging the factual sufficiency of the evidence supporting an adverse finding on which the appealing party did not have the burden of proof, the appellant must demonstrate that there is insufficient evidence to support the adverse finding." *Monasco*, 339 S.W.3d at 830. "The evidence is sufficient to support the adverse finding if the evidence is such that reasonable minds could differ on the meaning of the evidence, or the inferences and conclusions to be drawn from the evidence." *Id.* at 830–31. "A challenge to the factual sufficiency of the evidence will be sustained if the evidence is so weak or the verdict is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Id.* at 831 (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986)).

"In our review, we must credit evidence favorable to the finding if a reasonable fact-finder could and disregard contrary evidence unless a reasonable fact-finder could not." *Antolik v. Antolik*, No. 06-18-00096-CV, 2019 WL 2119646, at *3 (Tex. App.—Texarkana May 15, 2019,

17

pet. denied) (mem. op.); *Hampden Corp.*, 2014 WL 2921655, at *6 (citing *City of Keller*, 168 S.W.3d at 827)). In a bench trial, the trial court, as the fact-finder, determines the witnesses' credibility and the weight of their testimony. *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005). "As sole arbiter of a witness' demeanor and credibility, the trial court may believe all, part, or none of a witness' testimony." *Antolik*, 2019 WL 2119646, at *3 (citing *In re E.M.*, No. 06-17-00083-CV, 2017 WL 5586633, at *2 (Tex. App.—Texarkana Nov. 21, 2017, no pet.) (mem. op.) (citing *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam))). "We view the evidence in the light most favorable to the judgment and presume the trial court resolved all conflicts in the evidence in support of the judgment." *Id.*; *City of Keller*, 168 S.W.3d at 820.

Since "[t]he motive with which [the original] conveyance is made and the fears by which it is prompted are of no importance unless there are creditors to be protected by the statute,"[10] we first examine whether sufficient evidence supported the trial court's finding that no creditor of Lyn was shown. Because Appellants had the burden of proof and they are attacking adverse findings, to prevail on their legal sufficiency challenge, they must show both that no evidence supported the trial court's finding and that the evidence conclusively established the finding urged by Appellants. *PlainsCapital Bank*, 459 S.W.3d at 557.

The evidence at trial offered only one possible creditor of Lyn at the time she conveyed her interest in the Family Farm, the cross-plaintiff in the New Mexico lawsuit, Amy Walker Downey. Among the documents from that lawsuit introduced into evidence were the cross-claim asserted by Downey and the order to dismiss that lawsuit. Neither of those documents show that

---

[10]*Rivera*, 63 S.W. at 126.

18

Lyn, personally, was ever a party to the lawsuit. The heading of both documents lists among the cross-defendants "Pettit Mortgage," without any indication of the nature of that entity. However, the body of the cross-claim identifies this cross-defendant as "Petit [sic] Mortgage, Inc. . . . a New Mexico Corporation." The body of the order of dismissal specifies the cross-defendant against whom all causes of action were dismissed as "Pettit Mortgage, Inc."

Since neither party contends that there is any material difference between New Mexico law and Texas law, those laws are presumed to be the same. *El Paso Mktg., L.P. v. Wolf Hollow I, L.P.*, 383 S.W.3d 138, 140 n.26 (Tex. 2012) (citing *Coca-Cola Co. v. Harmar Bottling Co.*, 218 S.W.3d 671, 685 (Tex. 2006)). All of the claims asserted in the New Mexico lawsuit relate to or arise from a loan and mortgage contract allegedly issued to Downey by Pettit Mortgage, Inc., not noted as involving Lyn in any respect. Under Texas law, a shareholder may not be held liable to a creditor of the corporation "on any contractual obligation or any matter relating to or arising from the obligation" unless the shareholder "caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the" shareholder. TEX. BUS. ORG. CODE ANN. § 21.223(a)(2), (b); *see Texas-Ohio Gas, Inc. v. Mecom*, 28 S.W.3d 129, 136–37 (Tex. App.—Texarkana 2000, no pet.). No evidence or pleading in this case suggested that Lyn had used Pettit Mortgage, Inc., for the purpose of perpetrating, or that she perpetrated, an actual fraud on Downey for her direct personal benefit. There was no evidence of such fraud. Consequently, there was no showing that Lyn would be liable to Downey for any obligation of Pettit Mortgage, Inc., whether at the time of her conveyance or in the future. As a result, there was no showing that Downey had any claim against Lyn

19

personally. *See* TEX. BUS. & COM. CODE ANN. § 24.002(3). There also was no showing that Downey was or might reasonably become Lyn's creditor. *See* TEX. BUS. & COM. CODE ANN. § 24.002(4). Therefore, legally sufficient evidence supported the trial court's finding that no creditor of Lyn had been shown to exist.

To prevail on their factual sufficiency challenge, Appellants had to show on appeal that the trial court's finding was against the great weight and preponderance of the evidence. *Dow Chem. Co.*, 46 S.W.3d at 242. Countering the evidence that only Pettit Mortgage, Inc., was sued by Downey, Appellants point to statements made by Lyn in her pleadings, other documents, and testimony that they contend shows Downey was also a creditor of Lyn.

In her Sixth Amended Original Petition, which was her live pleading at the time of trial, Lyn stated that, at the time of her conveyance to Bob, "a lawsuit was pending against Lyn regarding a former mortgage brokerage business in New Mexico that had remain [sic] unresolved for a [sic] several years."[11] Appellants also cite an email that Lyn sent to Bob in March 2014 in which she stated, "I acted for the greater good in hopes that if [sic] the person suing me would not find out about my ownership of the farms," and another email sent in May 2014, in which she referred to "the lawsuit [she] was involved in," and stated "that the lawsuit settled before going to court, is

---

[11]In their reply brief, Appellants contend that Lyn judicially admitted that Downey was a creditor when she pled in her original petition that "she had been sued regarding an old business transaction." However, statements made "in superseded pleadings are not conclusive and indisputable admissions." *Sosa v. Cent. Power & Light*, 909 S.W.2d 893, 895 (Tex. 1995). Appellants do not contend that the statements made in Lyn's live pleadings were judicial admissions. Nevertheless, even if they had, the party relying on the opposing party's pleadings as judicial admissions "must protect his record by objecting to the introduction of controverting evidence contrary to that admission of fact." *Marshall v. Vise*, 767 S.W.2d 699, 700 (Tex. 1989) (citing *Houston First Am. Sav. v. Musick*, 650 S.W.2d 764, 769 (Tex. 1983). In this case, Appellants introduced Downey's cross-petition that identified the party being sued as Pettit Mortgage, Inc.

20

over and that the plaintiff (ie [sic] the creditor) can never come after [her]." They also cite Lyn's acknowledgment that, in her deposition, she stated that, when she talked to Bob about the New Mexico lawsuit, she thought it might be a serious threat and that Downey might try to get her hands on the Family Farm, and her testimony regarding the March 2014 and May 2014 emails.

In their reply brief, Appellants also point to other aspects of the documents from the New Mexico lawsuit: the heading of the case refers to "Pettit Mortgage," the body of the cross-petition refers repeatedly to "Pettit Mortgage," certain notices in the New Mexico lawsuit refer to only "Pettit Mortgage" and are addressed to "Marilyn Pettit, Pettit Mortgage" or to "Marilyn Petitt," the pro se answer of Pettit Mortgage is signed "Marilyn Pettit, Owner Broker, Pettit Mortgage," a judgment following a prior mediation refers to "Pettit Mortgage," and the Settlement Agreement that finally resolved the New Mexico lawsuit releases "Pettit Mortgage, Inc., Pettit Mortgage, Marilyn Pettit Tabor a/k/a Lyn Pettit/Lyn Pettit Tabor."[12]

Although Appellants assert that that evidence shows that Downey was Lyn's creditor, we believe "that reasonable minds could differ on the meaning of the evidence, or the inferences and conclusions to be drawn from the evidence." *Monasco*, 339 S.W.3d at 830–31. The statements in Lyn's Sixth Amended Original Petition regarding the New Mexico lawsuit conflict somewhat, but not entirely, with the pleadings from that lawsuit that clearly identify the defendant being sued as

---

[12]Appellants also point to the fact that Lyn did not testify at trial that Pettit Mortgage was a corporation or anything other than a sole proprietorship. However, there was no testimony at trial regarding the entity status of Pettit Mortgage. In other words, there was no testimony that it was a sole proprietorship, a corporation, a partnership, or a limited liability company. Therefore, there could be no reasonable inference of its entity status based on the absence of testimony. Further, before Lyn's testimony both the cross-claim and the order to dismiss the lawsuit, identifying the defendant as "Pettit Mortgage, Inc., . . . a New Mexico Corporation," had been introduced into evidence. Since this evidence was never challenged, and since it was Appellants' burden to establish that Downey was Lyn's creditor, Lyn may have concluded there was no need to further testify about the entity status.

21

Pettit Mortgage, Inc., a New Mexico corporation. Further, the references to Pettit Mortgage in pleadings and other documents in the New Mexico lawsuit more readily support an inference that Downey referred to the defendant actually identified, i.e., Pettit Mortgage, Inc., than that she referred to a sole proprietorship owned by Lyn, an allegation that does not appear there. Further, it is not uncommon in settlement agreements, when the defendant is a corporation owned or controlled by a shareholder, to include the shareholder and any assumed names among the parties being released, even if the shareholder has no liability.

In examining Lyn's testimony regarding when she first talked with Bob and when she thought the New Mexico lawsuit was a serious threat and that Downey might be able to get her interest in the Family Farm, it is not clear that she believed this before her conversation with Bob. When considering this testimony with Lyn's testimony that Bob scared her regarding the need to protect the Farm from the lawsuit, it would be reasonable to infer that Lyn's perceived threat arose during her conversation with Bob, not before it. Likewise, it would be reasonable to infer that Lyn's statements in the March 2014 and May 2014 emails were products of her conversation with Bob. Finally, the evidence from the New Mexico lawsuit showed that the defendant named in both the cross-claim and the order to dismiss the lawsuit was Pettit Mortgage, Inc.

Under this record, we hold that factually sufficient evidence supported the trial court's finding that a creditor of Lyn was not shown. Therefore, we overrule Appellants' factual and legal sufficiency challenges to this finding.[13]

---

[13]Since no creditor of Lyn was shown, and thus no creditor could have been injured by her conveyance to Bob, her motives or fears in making the conveyance are unimportant. *See Rivera*, 63 S.W. at 126. Therefore, we need not address Appellants' sufficiency of the evidence challenges to the trial court's finding that Lyn did not have actual intent to defraud or hinder a creditor.

*(B)      Concluding that the Illegality Defense Was Not Available Is Not Reversible Error*

Appellants also challenge the trial court's conclusion of law that, because of Bob's fraud in inducing Lyn to transfer her interest to him and because of Bob's breach of his fiduciary duty, Appellants were barred from asserting the illegality defense.[14]  Appellants argue that, contrary to the trial court's conclusion, it is their illegality defense that bars Lyn's claims for fraud, breach of fiduciary duty, return of her property, and imposition of a constructive trust.  We overrule this issue, because, even if the trial court's conclusion of law was erroneous, reversal is not required. The affirmative defense of illegality was inapplicable under the facts of this case.  *See Bos v. Smith*, 556 S.W.3d 293, 299 (Tex. 2018); *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002).

We review the trial court's conclusions of law de novo.  *Marchand*, 83 S.W.3d at 794.  A trial court's conclusions of law may not be challenged for factual insufficiency, but we may review the conclusions to determine whether they are correct based on the facts.  *Id.*  "An erroneous conclusion of law does not require reversal if the trial court rendered the proper judgment."  *Bos*, 556 S.W.3d at 299 (citing *Marchand*, 83 S.W.3d at 794).

In this case, Appellants' illegality defense is premised on their assertion that, when Lyn transferred her interest in the Family Farm to Bob, she did so with the intent to defraud or hinder her "creditor" in the New Mexico lawsuit.  We have determined above that there was legally and factually sufficient evidence supporting the trial court's finding that no creditor of Lyn was shown.

---

[14]Although the trial court also concluded that Appellants were barred from asserting the Statute of Frauds, Appellants do not challenge that conclusion of law.

As we previously noted, Texas courts have long held that, when a current or future creditor is not shown to exist, the rule barring enforcement of an agreement to reconvey is not applicable. *See Rivera*, 63 S.W. at 126; *Cordova*, 14 S.W. at 209; *Harmon*, 39 S.W.2d at 590; *Wells*, 252 S.W. at 1025; *Stout*, 674 S.W.2d at 826–27; *White*, 519 S.W.2d at 693; *Barber*, 173 S.W.2d at 664.

In *Rivera*, Rivera conveyed property to his sister on an agreement that she would hold it in trust for him for the purpose of avoiding a claim for alimony that he feared his wife would make against him in a divorce suit in Illinois. After the divorce was granted, Rivera sought reconveyance of the property from his sister's children. At trial, there was no evidence that a claim for alimony was made in the divorce proceedings or that facts existed that would entitle Rivera's ex-wife to alimony. The trial court denied recovery, and the court of appeals affirmed based on the rule that reconveyance could not be enforced because of Rivera's intent in the original conveyance to defraud his wife of alimony. *Rivera*, 63 S.W. at 125. The Texas Supreme Court recognized that a claim for alimony in a divorce would make the wife a creditor and that it was settled "that deeds made in fraud of creditors pass title as between the parties to them, and that agreements on the part of grantees to hold in trust and to reconvey will not be enforced." *Id*. at 125–26 (citing *Eastham v. Roundtree*, 56 Tex. 110 (1882)). The court also recognized that the policy barring enforcement of such agreements was to deter debtors from attempting "to put their property beyond the reach of creditors, and at the same time secure to themselves the enjoyment of it by secret arrangements with those to whom it is apparently conveyed." *Id*. at 126.

> However, the court held that the statute prohibiting such fraudulent transfers
>
> does not prohibit conveyances by persons who are not indebted, and no policy of the law is thwarted by a mere motive which cannot work injury to creditors. *Ellis*

24

*v. Valentine*, 65 Tex. 547 [1886]. The motive with which such a conveyance is made and the fears by which it is prompted are of no importance unless there are creditors to be protected by the statute. When the statute does not apply to the case, there is nothing to prevent the court from enforcing the rights of the parties as they are fixed by their agreements . . . and we think the law has no concern with the futile intent to protect the property from a claim which its owner fears may be asserted against him, but which is never asserted, and does not exist.

*Id.* Since there was no evidence at trial that Rivera's ex-wife would be entitled to alimony under Illinois law, no creditor, whether present or future, was shown to exist. Therefore, under the facts of that case, the court held that there was nothing to preclude the enforcement of the agreement to reconvey. *Id.*

As we have previously discussed, there was no showing that Downey, the plaintiff in the New Mexico lawsuit, had any claim against Lyn that reasonably could have made her Lyn's creditor. Although Downey filed suit against Pettit Mortgage, Inc., as in *Rivera*, there was no showing that Downey had any claim against Lyn or that she would have been able to enforce against Lyn any judgment obtained against Pettit Mortgage, Inc. Thus, even if Appellants' allegations that Lyn intended to defraud or hinder Downey by conveying her interest in the Family Farm to Bob with an agreement that he would reconvey it to her after the lawsuit was over were true, her motive was of no importance, since Downey was not shown to be Lyn's creditor. Consequently, the rule barring enforcement of agreements to reconvey when the original conveyance was made with the intent to defraud or hinder present or future creditors is not applicable.

Since the Appellants' illegality affirmative defense is premised on the rule barring enforcement of agreements to reconvey, their defense is inapplicable.[15] Consequently, even if the trial court's conclusion of law that the Appellants were barred from asserting the illegality defense was erroneous, the trial court rendered the proper judgment in refusing to apply the illegality defense. Therefore, any such error by the trial court would not be reversible. We overrule this issue.

*(3)     Bob's Actual Fraud Supports a Constructive Trust*

"To obtain a constructive trust, the proponent must prove (1) the breach of a special trust, fiduciary relationship, or actual fraud, (2) unjust enrichment of the wrongdoer, and (3) tracing to an identifiable res." *Gray*, 428 S.W.3d at 315 (citing *Troxel v. Bishop*, 201 S.W.3d 290, 297 (Tex. App.—Dallas 2006, no pet.)). Thus, the imposition of a constructive trust may be based either on the breach of a special trust or a fiduciary relationship, or on actual fraud. "Where the grantor

---

[15]In their brief, Appellants place great emphasis on Lyn's intent and cite a number of cases containing broad language to support their argument that if the grantor's intent was to defraud *possible* future creditors, then enforcement of an agreement to reconvey would be barred. *See Lott v. Kaiser*, 61 Tex. 665, 673 (1884); *Skelley v. Hayden*, No. 05-99-00802-CV, 2001 WL 379255, at *2 (Tex. App.—Dallas Apr. 17, 2001, judgm't vacated and remanded by agr.) (op. on reh'g) (not designated for publication); *Lubojacky v. Lubojacky*, No. 01-97-01431-CV, 1999 WL 695584, at *1 (Tex. App.—Houston [1st Dist.] Sept. 9, 1999, no pet.) (not designated for publication); *In re Marriage of Parker*, 997 S.W.2d 833, 838 (Tex. App.—Texarkana 1999, pet. denied); *Cerda v. Lopez*, No 04-98-00516-CV, 1999 WL 417847, at *1 (Tex. App.—San Antonio June 23, 1999, pet. denied) (not designated for publication); *De La Pena v. Elzinga*, 980 S.W.2d 920, 921 (Tex. App.—Corpus Christi 1998, no pet.); *Poe v. Hamlin Nat'l Bank*, 921 S.W.2d 515, 517 (Tex. App.—Eastland 1996, writ denied); *Leal v. Cortez*, 603 S.W.2d 262, 264 (Tex. App.—Corpus Christi 1980, writ ref'd n.r.e.); *Letcher v. Letcher*, 421 S.W.2d 162, 168–69 (Tex. App.—San Antonio 1967, writ dism'd). However, in each of those cases, except one, an actual present or future creditor with a viable claim was clearly shown to exist at the time of the conveyance. *See Lott*, 61 Tex. at 673 (wife asserting claim for alimony in divorce); *Skelley*, 2001 WL 379255, at *2 (outstanding judgment in favor of United States); *Parker*, 997 S.W.2d at 835, 838 (outstanding tax liability to IRS); *Cerda*, 1999 WL 417847, at *1 (hiding property from wife during divorce); *De La Pena*, 980 S.W.2d at 921 (banks calling in notes and lienholders threatening foreclosure); *Poe*, 921 S.W.2d at 516 (Citicorp demanded $1,000,000.00 payment on guaranty agreement, later reduced to judgment); *Leal*, 603 S.W.2d at 263 (grantor personally liable on delinquent note securing son's mortgage); *Letcher*, 421 S.W.2d at 167 (grantor had been sued following an accident). In *Lubojacky*, it is unclear whether an actual creditor was shown. *Lubojacky*, 1999 WL 695584, at *1.

26

voluntarily conveys to the grantee on a false oral promise that the grantee will reconvey, there is actual fraud justifying the imposition of a constructive trust." *In re Marriage of Braddock*, 64 S.W.3d 581, 587 (Tex. App.—Texarkana 2001, no pet.) (citing *Thigpen v. Locke*, 363 S.W.2d 247, 250 (Tex. 1962)).

Among the trial court's findings of fact that have not been challenged by Appellants were:[16]

1.      Bob convinced Lyn that the only move to make was for her to transfer the property to him—temporarily—and not to her two children, permanently.  He assured her that when her litigation was over in New Mexico, he would return her undivided one[-]half interest back to her.  He further convinced her that she should get her name off the bank account they jointly owned for the management of the property so that no one would see her name on it.

11.h.   After receiving a demand letter from Lyn's attorney, Bob's attorney sends a letter stating that Bob never promised to re-convey the property and that he told Lyn the transaction would be final at the time they entered into the agreement to move the property into his name; that theses [sic] conveyances would be final and irrevocable.

Appellants also did not challenge the trial court's conclusion of law that "Bob perpetrated a fraud on Lyn to induce her to transfer her property to him."[17]  Unless no evidence supports the finding, or the contrary is established as a matter of law, we are bound by the trial court's unchallenged findings of fact. *In re E.R.C.*, 496 S.W.3d 270, 288 (Tex. App.—Texarkana 2016, pet. denied).

Common-law fraud consists of "a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which

---

[16]In their reply brief, Appellants concede that they did not challenge finding of fact number 7, but take the position that the finding was irrelevant in light of their illegality defense.

[17]This conclusion of law is included in the trial court's conclusion of law number 2, which contains both findings of fact and conclusions of law.  Also included in conclusion of law number 2 is the trial court's legal conclusion that because of Bob's fraud, the Appellants were barred from asserting their illegality defense.  This latter conclusion of law is the only conclusion of law contained in conclusion of law number 2 that Appellants have challenged on appeal.

was intended to be acted on, which was relied on, and which caused injury." *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015) (quoting *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998) (quoting *Sears, Roebuck & Co. v. Meadows*, 877 S.W.2d 281, 282 (Tex. 1994)). Fraud in the inducement is a category of common-law fraud that "involves a promise of future performance made with no intention of performing at the time it was made." *Id*. at 153. "Because fraudulent inducement arises only in the context of a contract, the existence of a contract is an essential part of its proof." *Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018) (citing *Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001)).

Lyn's testimony that she relied on Bob, that he convinced her to convey her interest temporarily to him to avoid the possibility of her children becoming involved in a lawsuit, that he assured her the transfer would be temporary, and that he would reconvey her interest to her provided some evidence that he made her the promise to reconvey the property to her if she deeded it to him first, that he intended for her to rely on his promise, and that there was, therefore, a contract between them, which she performed by conveying her interest to Bob. Her testimony that she trusted Bob at his word based on the nature of their relationship and Bob's expertise in legal matters and that she would not have made the conveyance absent his promise to reconvey it provided some evidence that she relied on Bob's representations. Bob's consistent denial that he ever agreed to reconvey Lyn's interest and that he never intended to do so provides some evidence that Bob made the promise with no intention of performing it. Also supporting this finding was Bob's admission that, in the conversation where Bob convinced Lyn to convey her interest to him,

28

he left Lyn with the understanding that there would be reconveyances so that her children would be owners of her interest, even though he never intended for that to be the case. The evidence also showed that the conveyance was made without other consideration and that Bob refused to reconvey Lyn's interest in the Farm and the checking account, causing Lyn to lose her interest in both. Therefore, some evidence supports the trial court's unchallenged findings.[18]

The trial court's findings that Bob induced Lyn to convey her interest in the Family Farm based on his promise to reconvey it back to her and that he later denied that there was ever an agreement in the first place support its legal conclusion that Bob had committed actual fraud in inducing the transfer of Lyn's interest in the Farm. *See Braddock*, 64 S.W.3d at 587 (evidence of agreement, later denied, supports an inference of lack of intent to fulfill agreement). Consequently, Bob's fraud in the inducement would support the imposition of a constructive trust.[19]

Since Bob's fraud in the inducement supports the imposition of a constructive trust and Appellants' illegality defense is inapplicable under the facts of this case, the trial court did not abuse its discretion in imposing a constructive trust. We overrule Appellants' issue challenging the imposition of a constructive trust.[20]

---

[18]The trial court's findings could support both common-law fraud and fraud in the inducement. The evidence outlined above would also constitute some evidence of common-law fraud.

[19]Bob does not challenge the trial court's implied findings that he was unjustly enriched and that the res was identifiable.

[20]Since actual fraud will support the imposition of a constructive trust, we need not address Appellants' issue that insufficient evidence supported the trial court's finding of a confidential relationship.

*(4)      Exemplary Damages Are Supported by the Evidence*

In addition to imposing a constructive trust, the trial court entered judgment against Bob for $50,000.00 in exemplary damages based on its finding that Bob "intentionally and maliciously committed common-law and statutory fraud." In its findings of fact and conclusions of law, the trial court based its award of exemplary damages on its finding that Bob's conduct in defrauding Lyn and his subsequent actions to rebuff Lyn's rightful claims were "intentional, outrageous and malicious" and that Lyn suffered mental anguish as a result of Bob's conduct. Bob challenges the legal and factual sufficiency only of the evidence supporting the trial court's finding that Lyn suffered mental anguish as a result of Bob's conduct. He argues that the trial court predicated its exemplary damages award solely on its finding that Lyn suffered mental anguish and cites the Texas Supreme Court's holding in *Saenz v. Fidelity and Guaranty Insurance Underwriters* that

> *mental anguish damages* [can]not be awarded without either "direct evidence of the nature, duration, or severity of [plaintiffs'] anguish, thus establishing a substantial disruption in the plaintiffs' daily routine[,"] or other evidence of "a high degree of mental pain and distress" that is "more than mere worry, anxiety, vexation, embarrassment, or anger."

*Saenz v. Fid. & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996) (emphasis added) (quoting *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995)). He goes on to argue that the evidence supporting the trial court's finding of *mental anguish* was factually and legally insufficient under the clear and convincing threshold required to award exemplary damages.[21] Lyn

---

[21]At the end of his insufficiency analysis regarding mental anguish, Bob states, "Bob also challenges the award as excessive under the same evidentiary standard." We interpret this statement as challenging the amount of damages awarded resulting from Bob causing Lyn mental anguish, of which there was none awarded. As a result, this issue is without merit. To the extent this sentence is an attempt to challenge the amount of the exemplary damages award, it has been waived as a result of inadequate briefing. The Texas Rules of Appellate Procedure require that an appellant's brief "must contain a clear and concise argument for the contentions made, with appropriate citations to authorities

responds that the evidence was sufficient to support a finding that she suffered compensable mental anguish. She also argues that the trial court's findings of fraud and malice will support the award of exemplary damages.

Neither party addressed the question of whether a finding that a party suffered mental anguish will support an award of exemplary damages. However, we need not address this question since Bob did not challenge the trial court's findings that Bob committed fraud and that his conduct was malicious, either of which, as Lyn points out, will support an award of exemplary damages.

As applicable to this case, the Texas Civil Practice and Remedies Code provides that

exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from:

    (1)    fraud; [or]

    (2)    malice.

TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(a)(1)–(2). "'Clear and convincing' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. CIV. PRAC. & REM. CODE. ANN. § 41.001(2) (Supp.). "'Fraud' means fraud other than constructive fraud." TEX. CIV. PRAC. & REM. CODE. ANN. § 41.001(6) (Supp.). "'Malice' means a specific intent by the

---

and to the record." TEX. R. APP. P. 38.1(h). "Bare assertions of error, without argument or authority, waive error." *In re Estate of Curtis*, 465 S.W.3d 357, 379 (Tex. App.—Texarkana 2015, pet. dism'd) (quoting *McKellar v. Cervantes*, 367 S.W.3d 478, 484 n.5 (Tex. App.—Texarkana 2012, no pet.)). In his brief, Bob provides no argument, and makes no citations to any authority or to the record in support of this complaint. Consequently, this complaint has been waived.

defendant to cause substantial injury or harm to the claimant." Tex. Civ. Prac. & Rem. Code.

Ann. § 41.001(7) (Supp.).

As discussed earlier, we are bound by an unchallenged finding if some evidence supports

it. *See E.R.C.*, 496 S.W.3d at 288. However, when the standard is clear and convincing evidence,

our analysis is somewhat different than under a preponderance standard:

> In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. To give appropriate deference to the fact-finder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the fact-finder resolved disputed facts in favor of its finding if a reasonable fact-finder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable fact-finder could have disbelieved or found to have been incredible. This does not mean that a court must disregard all evidence that does not support the finding. Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.
>
> If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable fact-finder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient.

*Sw. Bell Telephone Co. v. Garza*, 164 S.W.3d 607, 627 (Tex. 2004) (quoting *In re J.F.C.*, 96

S.W.3d 256, 266 (Tex. 2002)).

We have previously held that there was some evidence supporting both fraud in the

inducement and common-law fraud under a preponderance-of-the-evidence standard. In addition

to that evidence, Bob's wife testified that, based on Bob and Lyn's relationship, Lyn would have

trusted that Bob would perform any promise that he made to her. The evidence also showed that

Bob drove to Waco to obtain the executed deeds, then drove to Hunt and Delta Counties to file

32

them the same day. Within a few weeks, Bob had severed the mineral estate by conveying all of the minerals in and under the Farm, including Lyn's interest, to a sole proprietorship owned by Bob. After Lyn emailed Bob requesting that he prepare the paperwork to restore her interest, he did not answer the email or accept any of her telephone calls for about a month. At that time and for several months thereafter, Bob told Lyn and others that he could not reconvey her interest because it would be illegal to do so at that time. During the same time, he conveyed the mineral estate to a trust of which his son, Joseph, was trustee. Bob then conveyed the surface estate to his three children, reserving a life estate for himself. Over a year later, when Lyn hired an attorney to make a written demand, Bob responded and, for the first time, denied that he had made a promise to reconvey Lyn's interest. Shortly before this lawsuit was filed, all of the interest in the surface and minerals were conveyed to Bob's son, Jeffrey, as trustee of Big Horn Phalanx Trust. Joseph testified that that was done to protect the interests from Lyn.

We find that the evidence previously discussed, coupled with the evidence of Bob's actions in attempting to prevent Lyn from recovering her interest, viewed in the light most favorable to the finding of fraud, whether fraud in the inducement or common-law fraud, was some evidence on which a reasonable trier of fact could form a firm conviction or belief that the finding was true. *See Garza*, 164 S.W.3d at 627. Since some clear and convincing evidence supports the trial court's finding of fraud, and a finding of fraud will support the imposition of exemplary damages, we overrule this issue.

33

*(5)     Attorney Fees Are Supported by the Evidence*

Appellants also challenge the trial court's award of attorney fees.  In its judgment, the trial court awarded attorney fees "pursuant to Section 37.001 et seq. and Section 27.01 of the Texas Business and Commerce Code."[22]  *See* TEX. BUS. & COM. CODE ANN. § 27.01; TEX. CIV. PRAC. & REM. CODE ANN. § 37.009.  In its findings of fact and conclusions of law, the trial court found that it was necessary to declare void the many subsequent transactions perpetrated by Bob and that Lyn at least implicitly pled the existence of a contract, then concluded that she was entitled to recover attorney fees under either Section 37.001 or Section 27.01.  Since we find that the evidence supports the award of attorney fees under Section 27.01, we will address Appellants' complaints related to an award of attorney fees only under that statute.

Under Section 27.01, a person who commits fraud in a transaction involving real estate "shall be liable to the person defrauded for reasonable and necessary attorney's fees, expert witness fees, costs of copies of depositions, and costs of court."  TEX. BUS. & COM. CODE ANN. § 27.01(e).  The statute defines "[f]raud in a transaction involving real estate" as

(1)     [a] false representation of a past or existing material fact, when the false representation is

(A)     made to a person for the purpose of inducing that person to enter into a contract; and

(B)     relied on by that person in entering into that contract; or

(2)     [a] false promise to do an act, when the false promise is

---

[22]There is no Section 37.001 of the Texas Business and Commerce Code.  Based on its findings of fact and conclusions of law, we presume the trial court was referring to Section 37.001, et seq., of the Texas Civil Practice & Remedies Code, relating to declaratory judgments.

34

> (A)    material;
>
> (B)    made with the intention of not fulfilling it;
>
> (C)    made to a person for the purpose of inducing that person to enter into a contract; and
>
> (D)    relied on by that person in entering into that contract.

TEX. BUS. & COM. CODE ANN. § 27.01(a). Appellants initially complain that Lyn did not plead the existence of a contract to reconvey Lyn's property interests and that the Statute of Frauds would bar both the enforcement of an oral contract to reconvey her property and any fraud claim based on it. However, Appellants mischaracterize the basis of Lyn's fraud complaint. Lyn does not assert that there was a *contract* to reconvey her interest, nor does she seek to enforce or recover the benefits of any such contract.[23] Rather, Lyn asserts that the contract, or transaction, she was induced to enter based on Bob's false *promise* to reconvey her interest was her original conveyance to Bob.[24] It was that original transaction that Lyn sought to void, and she sought the imposition

---

[23]In *Haaze v. Glazner*, the Texas Supreme Court held that "the Statute of Frauds bars a fraud claim to the extent that the plaintiff seeks to recover as damages the benefit of a bargain that cannot otherwise be enforced because it fails to comply with the Statute of Frauds" but that a fraud claim does not "contravene the Statute of Frauds to the extent that he seeks out-of-pocket damages incurred in relying upon [the defendant's] misrepresentations." *Haaze v. Glazner*, 62 S.W.3d 795, 799 (Tex. 2001). In this case, Lyn did not seek enforcement of a contract, but only sought rescission of the original conveyance and a constructive trust. We also note that "strict proof of a prior confidential relationship and unfair conduct or unjust enrichment on the part of the wrongdoer" is an exception to the Statute of Frauds. *Ginter v. Taub*, 675 S.W.2d 724, 725 (Tex. 1984) (quoting *Rankin v. Naftalis*, 557 S.W.2d 940, 944 (Tex. 1977)).

[24]In their reply brief, Appellants assert that Section 27.01 does not apply unless there is a valid, enforceable contract and there is a misrepresentation of material fact made to induce the plaintiff into that contract for the sale of land. Appellants argue that, since there was no written contract binding Bob to reconvey Lyn's interest in the Farm, there was not an enforceable contract. As noted above, Lyn sought rescission of her original conveyance to Bob based on his fraudulent representations or promises. A trial court's order rescinding conveyances of real property is a permissible recovery under Section 27.01. *Kelley v. Kelley*, No. 11-03-00278-CV, 2004 WL 2359986, at *4 (Tex. App.—Eastland Oct. 21, 2004, no pet.) (mem. op.); *see Stanfield v. O'Boyle*, 462 S.W.2d 270, 271 (Tex. 1971) (predecessor statute applicable when a conveyance has been made); *BLM of Brownwood, Inc. v. Mid-Tex Cellular Ltd.*, No. 11-11-00311-CV, 2014 WL 1285765, at *6 (Tex. App.—Eastland Mar. 31, 2014, no pet.) (mem. op.) (same). Further, Appellants did not request a finding, or conclusively establish, that Bob's promise was unenforceable. The

of a constructive trust based on Bob's fraud.[25]  Consequently, these complaints by Bob are without

merit.

Appellants also complain that Lyn failed to plead that Bob made a false promise for the

purpose of inducing her to enter into a contract.  However, in her live pleading at trial, Lyn pled

that

> Bob strongly encouraged Lyn not to convey the properties to her children, but to convey them to him on a temporary basis, and that whenever the litigation was no longer an issue that he would reconvey the properties to her on her request . . . . Trusting that Bob would do what he promised, Lyn conveyed her interest in the properties to him by deed on April 1, 2013. . . .
>
> By May of 2013, . . . Lyn began contacting Bob about reconveying her interest in the properties.  Bob initially attempted to delay the re-transfer, and ultimately began ignoring her phone calls.  In September of 2013, Lyn was finally able to reach Bob and discuss the matter[,] and he indicated during that conversation that he did not intend to reconvey her interest in the properties to her.

Then under a section entitled "Fraud," Lyn pled that

> [Bob] intentionally and knowingly made a material false representation to Lyn . . . that he would reconvey her 50% interest in these properties to her with the intent that she would rely on that false representation and enter into the transaction.  Bob . . . had no intention of fulfilling his promise.  Lyn . . . did in fact rely on that false representation to her detriment by conveying her interest in the properties to Bob

---

trial court's findings on fraudulent inducement incorporated the requisite elements of a contract, i.e., promise, reliance, and an agreement, and are sufficient to uphold the trial court's judgment and an award of attorney fees for statutory fraud.  *See Anderson*, 550 S.W.3d at 615; *Zorrilla*, 469 S.W.3d at 154.  We also note that the cases cited by Appellants are inapposite.  In *In re Okedokun*, the issue was whether a misrepresentation had been shown, not whether there was an enforceable contract.  *In re Okedokun*, 593 B.R. 469, 539–40 (Bankr. S.D. Tex. 2018).  In *Braley v. BAC Homes Loans Servicing, LP*, the subject contract was for non-foreclosure and mortgage modification and did not fall under Section 27.01.  *Braley v. BAC Homes Loans Servicing, LP*, No.3:10-CV-2105-O, 2011 WL 13233558, at *8 (Bankr. N.D. Tex. July 8, 2011).  Finally, *Burleson State Bank v. Plunkett* involved a construction loan transaction to which Section 27.01 was not applicable.  *Burleson State Bank v. Plunkett*, 27 S.W.3d 605, 611 (Tex. App.—Waco 2000, pet. denied).

[25]As noted earlier, although the trial court concluded that Appellants were barred from asserting the Statute of Frauds, Appellants did not challenge that conclusion on appeal.

> . . . , suffering significant economic and emotional damages when he failed to reconvey.
>
> . . . .
>
> This conduct constituted statutory fraud under Section 27.01 of the Texas Business & Commerce Code, common law fraud, actual fraud, constructive fraud and/or fraud in the inducement.

By these pleadings, Lyn sufficiently pled a cause of action under Section 27.01. This complaint is also without merit.

Bob also contends that there was legally and factually insufficient evidence to support the trial court's award of attorney fees under Section 27.01(e). The elements of fraud in a real estate transaction are essentially the same as those of common-law fraud or fraud in the inducement, except the false representation or false promise must be related to a contract involving real estate, and knowledge of the falsity of a representation is not a prerequisite. *See* TEX. BUS. & COM. CODE ANN. § 27.01(a); *Swanson v. Schlumberger Tech. Corp.*, 895 S.W.2d 719, 732 (Tex. App.—Texarkana 1994), *rev'd on other grounds by Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171 (Tex. 1997). Further, Section 27.01(a) is applicable only when a conveyance of the property has been made. *See Stanfield v. O'Boyle*, 462 S.W.2d 270, 271 (Tex. 1971) (decision under former statute); *Ahmed v. Mbogo*, No. 05-17-00457-CV, 2018 WL 3616887, at *9 (Tex. App.—Dallas July 30, 2018, pet. denied) (mem. op.). We have previously discussed the evidence of common-law fraud and fraud in the inducement and have held that there was legally sufficient evidence to support the trial court's findings. It is undisputed that there was a conveyance of Lyn's property interest. We find that factually and legally sufficient evidence supported the award of attorney fees under Section 27.01(e). We overrule this issue.

37

*(6)     Appellants' Challenge to the No-Gift Conclusion Was Forfeited*

Appellants also challenge the trial court's conclusion of law that the conveyances by Lyn to Bob were not gifts.[26]  However, other than pointing to one phrase in the subject deeds and stating that the deeds speak for themselves, Appellants provide no argument or citation to any legal authority.  The Texas Rules of Appellate Procedure require that an appellant's brief "must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."  TEX. R. APP. P. 38.1(h).  "Bare assertions of error, without argument or authority, waive error."  *In re Estate of Curtis*, 465 S.W.3d 357, 379 (Tex. App.—Texarkana 2015, pet. dism'd) (quoting *McKellar v. Cervantes*, 367 S.W.3d 478, 484 n.5 (Tex. App.—Texarkana 2012, no pet.)).  Since they have not provided a clear argument with citations to supporting legal authority, Appellants have forfeited this complaint.  We overrule this issue.

For the reasons stated, we affirm the trial court's judgment.

Josh R. Morriss III
Chief Justice

Date Submitted:     November 13, 2019
Date Decided:       January 15, 2020

---

[26]This conclusion of law was labeled by the trial court as a finding of fact, and Appellants seek to challenge the factual and legal sufficiency of the evidence supporting it.  It is more properly characterized as a conclusion of law, and we will, therefore, treat it as a conclusion of law.  *See Seasha Pools, Inc. v. Hardister*, 391 S.W.3d 635, 640 (Tex .App.—Austin 2012, no pet.) (trial court's designation of its holding as a finding of fact or conclusion of law is not controlling on appeal, and appellate court may treat court's holding as factual finding or legal conclusion regardless of label used).  Since an appellant may not challenge the factual sufficiency of evidence supporting a conclusion of law, we treat Appellants' issue as contending that the record does not support the trial court's conclusion.  *See Marchand*, 83 S.W.3d at 794.